**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CIVIL ACTION NO. 3:20-CV-00012-RGJ-RSE**

**MARY EITEL**                                                              **PLAINTIFF**

**VS.**

**PNC BANK, N.A.,** *et al.*                                        **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

Several discovery disputes have arisen between Plaintiff Mary Eitel ("Plaintiff") and

Defendants PNC Bank, N.A. ("PNC"); Wells Fargo Bank, N.A. ("Wells Fargo"); South State

Bank, N.A. ("South State Bank"); South State Advisory, Inc. ("South State Advisory"); and

Marilyn Casey Eitel ("Marilyn"). Pursuant to 28 U.S.C. 636(b)(1)(A), this matter has been referred

to the undersigned United States Magistrate Judge for resolution of all non-dispositive matters,

including discovery issues. (DN 102). Fully briefed, the disputes are ripe for adjudication.

I.  Background

This case centers on the administration of three trusts created by Plaintiff's grandparents

for which Plaintiff was a remainder beneficiary. Plaintiff accuses the various entity-Defendants of

mismanaging and depleting trust assets for the benefit of her late father, Paul Eitel, Jr., and his

wife, Defendant Marilyn Casey Eitel, contrary to the terms of the trusts and in breach of their

fiduciary duties to Plaintiff. (DN 104, at PageID # 1589).

During a telephonic conference with the Court on November 3, 2021, the parties presented

several discovery disputes preventing them from completing necessary depositions. (DN 215). The

Court instructed the parties to work to resolve these issues and submit a joint status report by

December 3, 2021. The Defendants jointly submitted a status report (DN 225) and Plaintiff

1

submitted her own (DN 226). Both indicated that the parties were largely unable to resolve their disputes. The Court held another conference on January 13, 2022 to discuss the ongoing issues. (DN 241). Thereafter, the Court ordered the parties to meet and confer over a fourteen-day period to discuss in good faith their remaining disputes, including those presented through motion practice. The parties again reported that they could not reach a resolution (DN 246), and the Court adopted their proposed briefing schedule on all outstanding discovery matters (DN 247).

## II.  Standard of Review

Federal Rule of Civil Procedure 26(b) governs the scope of discovery. Fed. R. Civ. P. 26(b). In relevant part, Rule 26 provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering . . . the parties' relative access to relevant information . . . and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* at (b)(1). However, all discovery permitted under the Rule is subject to the limitation imposed by Rule 26(b)(2)(C). Fed. R. Civ. P. 26(b)(2)(C). This section of the Rule allows the Court to limit the "frequency or extent of discovery" if: "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." *Id.* at (b)(2)(C)(i), (ii), & (iii).

Trial courts have wide discretion in dealing with discovery matters. *See S.S. v. E. Ky. Univ.*, 532 F.3d 445, 451 (6th Cir. 2008); *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir. 1981)). If the discovery sought appears relevant, "the party who is resisting production has the burden to establish that the material either does not come within the scope of relevance or is of

2

such marginal relevance that the potential harm resulting from production outweighs the presumption in favor of broad disclosure." *Invesco Institutional (N.A.), Inc. v. Paas*, 244 F.R.D. 374, 380 (W.D. Ky. 2007). However, following the opposing party's arguments, "if the relevancy of a particular discovery request in dispute is not apparent on the face of the request, then the burden to establish the relevancy of that request falls upon the party seeking the discovery." *Lillard v. University of Louisville*, No. 3:11-CV-554-JGH, 2014 WL 12725816, at *6 (W.D. Ky. Apr. 7, 2014). Thereafter, "courts generally employ a balancing test and will weigh the burdensomeness to the responding party against the requesting party's need for and relevance of the information sought to be obtained." *Id.*

## II. Analysis

### A. PNC Bank's Unopposed Motion for Protective Order

On November 5, 2021, Plaintiff served notice to depose a designated representative of Defendant PNC Bank. (DN 216). On December 5, 2021, PNC moved this Court for a protective order, alleging that its 30(b)(6) deposition would be unduly burdensome. (DN 227, at PageID # 2595). According to PNC, all information sought through Plaintiff's topics and document requests involve activity from 1976 through 1994, and neither PNC nor any of its predecessors-in-interest have had any involvement with the subject trusts since 1994. (*Id.*). PNC attests that it conducted a diligent search but could not identify "any employee or representative who has any firsthand knowledge or information related to or associated with any of the Topics or Document Requests set forth in the Notice." (*Id.*). PNC further posits that time spent on a deposition would be unduly burdensome and costly since any testimony its designee could provide would be limited to information within file records and documents PNC has been able to identify from its predecessor, which have all been produced to Plaintiff in discovery. (*Id.* at PageID # 2596).

3

Rule 26 allows for "a party or any person from whom discovery is sought" to seek a protective order from the Court. Fed. R. Civ. P. 26(c)(1). This Rule specifies that a motion for protective order must demonstrate "good cause" for its entry and include "a certification that the movant has in good faith conferred or attempted to confer with the other affected parties in an effort to resolve the dispute without court action." *Id.* Good cause exists when the moving party "articulate[s] specific facts showing 'clearly defined and serious injury' resulting from the discovery sought . . ." *Nix v. Sword*, 11 F. App'x 498, 500 (6th Cir. 2001) (citing *Avirgan v. Hull*, 118 F.R.D. 252, 254 (D.D.C. 1987)).

A corporation has a duty under Rule 30(b)(6) to provide a witness who is knowledgeable to provide binding answers on behalf of the corporation. *U.S., ex rel. Fry v. Health All. of Greater Cincinnati*, No. 1:03-CV-167, 2009 WL 5227661, at *2 (S.D. Ohio Nov. 20, 2009). Rule 30(b)(6) permits designated persons without personal knowledge to testify on behalf of a corporation on matters within the corporation's knowledge. *Cooley v. Lincoln Elec. Co.*, 693 F. Supp. 2d 767, 791 (N.D. Ohio 2010). "Counsel has the responsibility to prepare its designee to the extent matters are reasonably available, whether from documents, past employees, or other sources." *U.S., ex rel. Fry*, 2009 WL 5227661 at *2. Although Plaintiff failed to respond to PNC's motion, she apparently identified several individuals who worked for PNC's predecessor-in-interest during the time period at issue and would have knowledge of many of the topics in the notice. But as PNC notes, these individuals no longer work for PNC and could only serve as its representative in a 30(b)(6) deposition if they consent to do so. *See* Fed. R. Civ. P. 30(b)(6) ("The named organization must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf[.]").

PNC is not obligated to locate and attempt to designate any of the former employees

identified by Plaintiff. But PNC must adequately prepare and produce a corporate designee to testify on its behalf, and part of that preparation process may require interviewing the former employees. PNC points only to the cost of preparing and presenting a deposition witness, which it believes is unnecessary in light of prior written disclosures, in support of its motion. But such ordinary costs do not constitute serious injury to warrant issuance of a protective order.

That said, the Court agrees that the areas of examination outlined in Plaintiff's notice are overly broad and requiring PNC to prepare a witness to testify to those topics would be disproportionate to the needs of the case. Plaintiff outlined the following areas of examination for PNC's deposition:

1. Communications between PNC and [Paul Eitel,] Jr. from 1976 through 1994.
2. Communications between PNC and [Plaintiff] from 1976 through 1994 regarding the Trusts.
3. Communications between PNC and Marilyn from 1986 through 1994 regarding any trust.
4. Communications between PNC and Mary C. Eitel regarding the Trusts from 1976 through 1994.
5. PNC policies on trust beneficiary communications from 1975 through 1994.
6. All interpretations of the Trusts' terms as received by or acquired by or on behalf of PNC.
7. PNC policies on asset allocation in trust accounts from 1977 to 1994.
8. PNC policies on management of closely-held stock in PNC trust accounts from 1977 to 1994.
9. Communications to, by, or disclosed to PNC regarding Porter Paint stock from 1970 through 1988.
10. PNC policies on identification, establishment, verification, or investigation of ascertainable standards regarding trust accounts from 1976 through 1994.
11. PNC policies on wholesale trust account liquidation from 1977 through 1994.
12. Communications to PNC, by PNC, or disclosed to PNC regarding Bee's intent in the BLE TUW.
13. Communications to PNC, by PNC, or disclosed to PNC regarding Sr.'s intent in the PTE TUW or the PTE TUA.
14. Communications between PNC and Bee regarding the Trusts.
15. Communications between PNC and [Paul Eitel,] Sr. regarding the Trusts.
16. Communications between PNC and Bob Biggs regarding the Trusts.
17. Communications between PNC and Charles A. Robertson regarding the Trusts.
18. PNC policies on beneficiary input and control of investment decisions in trust accounts from 1977 to 1994.

19. PNC policies on disclosure of testator/testatrix intent to beneficiaries for trust accounts held or administered by PNC from 1977 to 1994.

20. PNC policies on trust transfers to other financial institutions from 1977 to 1995.

21. PNC policies on discretionary trust distributions including approval process, pre-approval investigation, pre and post approval verification, and disclosure of distributions to beneficiaries who are not receiving distributions.

22. PNC policies on trust department hiring, including qualifications required from 1977 to 1994.

23. PNC policies regarding disputes between beneficiaries and PNC on administration of trusts.

24. PNC policies from 1977 to 1994 on methods of determining apportionment of the costs of administration to principal versus income.

25. PNC methods of securities research utilized by PNC from 1977 to 1994.

26. PNC document retention policies from 1977 to 1994.

27. PNC interoffice communications regarding Porter Paint stock from 1977 to 1994.

28. Communications between Larry Warner and PNC trust department staff regarding management of Porter Paint Stock held in PNC trust accounts from 1977 to 1988.

29. Communications between Stephen Van Dyke and Larry Warner regarding asset allocation of the Trusts between 1977 to 1994.

30. Accounts held, controlled or for the benefit of [Paul Eitel,] Jr. at PNC from 1977 to 1994.

31. Accounts held, controlled or for the benefit of Marilyn at PNC from 1977 to 1994.

32. All distributions from the Trusts to any person or entity from 1970 to 1995.

33. PNC policies on methods of maintaining impartiality between trusts which have more than one beneficiary from 1977 to 1994.

34. PNC policies on methods of calculating net income of the Trusts.

35. Generation skipping trust taxation prior to the 1986 IRS GST tax reform.

36. PNC involvement in lobbying for adoption of uniform trust code provisions by the Kentucky General Assembly including names of PNC representatives and extent of the PNC involvement in the lobbying process.

37. All documents produced by PNC in the above-captioned lawsuit.

The Court finds that several of these topics are plainly relevant and within PNC's ability to reasonably and adequately prepare a witness. Acceptable deposition topics include Area Nos. 5, 6, 7, 8, 10, 11, 18, 19, 20, 21, 22, 23, 24, 25, 26, 33, 34, and 37, which all involve internal policies and procedures related to trust administration. However, the Court appreciates that no employee or representative for which it could designate to testify has any firsthand knowledge of the events at issue, and agrees that deposition testimony on Area Nos. 1, 2, 4, 12, 13, 14, 15, 16, 17, 29, 30,

31, and 32 would be senseless since PNC attests to having already provided the documents evidencing such communications. Lastly, the relevance of Area Nos. 3, 9, 27, 28, 35, and 36 is not clear on the face of the requests and, having failed to respond to PNC's Motion, Plaintiff did not meet her burden to establish their relevance.[1] PNC need not prepare a witness to testify on those topics. Accordingly, PNC's Motion for Protective Order (DN 216) is **GRANTED** in part and **DENIED** in part.

### B. Motions to Compel

Federal Rule of Civil Procedure 37 authorizes the filing of a motion to compel discovery when a party fails to answer interrogatories submitted under Rule 33 or respond properly to requests for production of documents under Rule 34. *Noble v. Ruby Tuesdays Restaurants, Inc.*, No. 2:06-CV-259, 2007 WL 3125131, at *1 (S.D. Ohio Oct. 23, 2007). "Rule 37(a) expressly provides that 'an evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond.'" *Id.* (quoting Fed. R. Civ. P. 37(a)(3)). When objecting on Rule 26(b)(2)(C) grounds, "the mere statement by a party that the interrogatory was overly broad, burdensome, oppressive and irrelevant is not adequate to voice a successful objection to an interrogatory." *Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*, No. 3:13-CV-82-CRS-CHL, 2017 WL 4799815, at *5 (W.D. Ky. Oct. 24, 2017) (citing *Josephs v. Harris Corp.*, 677 F.2d 985, 992 (3d Cir. 1982)). When a responding party claims discovery will cause "annoyance, embarrassment, oppression, or undue burden or expense," the Court may, for good cause, issue a protective order pursuant to Rule 26(c) that forbids or limits the discovery. Fed. R. Civ. P. 26(c).

### i. South State Advisory, Inc. and South State Bank's Motion to Compel

---

[1] Plaintiff likewise failed to establish their relevance in her Motion to Compel (DN 252) related to PNC's deposition.

On February 18, 2022, Defendants South State Advisory and South State Bank (together "South State") tendered their Motion to Compel Plaintiff to produce certain attorney-client communications concerning her allegations that South State breached their fiduciary duties as trustees. (DN 250, at PageID # 3787). South State also seeks communications reflecting Plaintiff's purported knowledge that her claims against them are barred under the applicable statutes of limitations. (*Id.* at PageID # 3788). Plaintiff positions that the information South State seeks is protected by the attorney-client privilege and work-product immunity, which she did not fully and intentionally waive when she provided South State a portion of a letter from an attorney in 2004. (DN 263, at PageID # 4993).

A party may implicitly waive the attorney-client privilege by asserting claims that in fairness require examination of protected communications. *Ross v. City of Memphis*, 423 F.3d 596, 605 (6th Cir. 2005). The applicable statutes of limitations in this case range from four to ten years, with some accrual periods beginning when Plaintiff learned of or should have learned of her injuries.[2] South State has produced several communications with and between Plaintiff and third parties which tend to show Plaintiff's knowledge of her alleged injuries as early as 2003. Still, Plaintiff argues she did not become aware of "a concrete legal injury" until 2019 or 2020 because of misrepresentations on the part of South State and Paul Eitel, Jr. (DN 263, at PageID # 4996).

The additional communications South State requests would tend to reflect when Plaintiff learned the extent of any alleged legal injuries and, consequently, when she learned of potentially actionable claims against South State. Moreover, Plaintiff volunteered an excerpted

---

[2] For example, a "four-year statute of limitations applies to civil RICO claims." *Hood v. United States Postal Serv.*, No. 17-1048, 2017 WL 6988055, at *2 (6th Cir. Oct. 11, 2017). The limitations period begins to run when plaintiff "should have known of [her] alleged injuries." *Id.* Likewise, a five-year statute of limitations applies to claims of fraud in Kentucky, and the limitation period starts to run on the date of discovery of the fraud. Ky. Rev. Stat. Ann. § 413.130(3).

communication which opened the door to these limitations period concerns. Plaintiff must therefore produce any communications that tend to show her knowledge of the actionable claims against South State Bank or South State Advisory[3] between January 1, 2003 and January 31, 2015. Plaintiff may redact these communications as necessary to protect confidential information.

That said, the Court does not agree that Plaintiff's disclosure of attorney-client correspondence in 2004, before bringing this action, constituted a general waiver of the attorney-client privilege in this litigation. And even if the Court deemed Plaintiff to have waived the attorney-client privilege, it would not necessarily mean she also waived work product immunity. *See In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.*, 293 F.3d 289, 304 (6th Cir. 2002). Thus, only those limited communications that could evidence implication of the tolling of statutes of limitations must be produced. Communications regarding claims for which the limitations period is not triggered by Plaintiff learning of her injuries need not be produced.[4] Likewise, the Court will not require Plaintiff to produce plainly privileged communications that do not directly reflect the timeframe and extent of her knowledge of the claims or that contain attorney work product. Should any communications be relevant to these limitations period issues and contain privileged information, Plaintiff may again redact as necessary.

South State Bank and South State Advisory's Motion to Compel (DN 250) is therefore **GRANTED** in part and **DENIED** in part.

ii. Plaintiff's Motion to Compel Tax Returns and Bank
Records of Marilyn Casey Eitel

Plaintiff's first Motion to Compel asks the Court to order Defendant Marilyn Casey Eitel to produce tax returns from 1986 to present. (DN 251, at PageID # 3846). Plaintiff likewise

---

[3] To be clear, Plaintiff need not produce communications evidencing knowledge of any/all claims at issue in this litigation; she need only produce such communications as they relate to South State Bank and/or South State Advisory.
[4] For example, claims for which the limitations period begins to run upon the Defendants' wrongful act or omission.

requests all bank records that South State Bank considered before disbursing trust funds to Marilyn and her late husband, Paul Eitel, Jr. (*Id.* at PageID # 3846). Marilyn indicates she only possesses copies of her tax returns from 2014 to present, as earlier copies were shredded, and notes that the IRS likewise only stores such records for seven years before they are destroyed by law. (DN 258, at PageID # 4771). Marilyn further positions that none of the trusts required a beneficiary to exhaust other resources before receiving disbursements, and notes that South State already provided Plaintiff with the documents it considered before disbursing funds. (*Id.* at PageID # 4773, 4772). Still, Marilyn suggests she is prepared to produce copies of the tax returns in her possession once the parties' Stipulated Protective Agreement is fully executed.[5] (*Id.*).

Plaintiff offers that she is willing to "alleviate any burden" on Marilyn by acquiring the desired tax returns directly from the IRS. However, this method would require Marilyn to pay $43 per requested return and, as Marilyn notes, the IRS may no longer have the requested records. Form 4506 specifies, "Copies of Forms 1040, 1040A, and 1040EZ are generally available for 7 years from filing before they are destroyed by law. Other returns may be available for a longer period of time." INTERNAL REVENUE SERVICE, IRS FORM 4506, REQUEST FOR COPY OF TAX RETURNS, no. 6 (Nov. 2021). Even if the IRS did retain the records at issue, requiring that Marilyn spend over $1,000 to obtain them would be highly burdensome. In light of the financial documents already produced to Plaintiff by South State, such a burden outweighs Plaintiff's need for this potentially duplicative information. The Court will therefore decline to order Marilyn to produce tax returns prior to 2014.

---

[5] Marilyn indicates all but one entity-defendant has signed the Stipulated Protective Agreement. The Court encourages the parties to finalize this document and timely honor agreements to produce documents subject to it. If the remaining entity-defendant does not intend to join in the agreement, anticipating that a full execution will occur and delaying document production in the meantime is futile.

As for the bank records Plaintiff requests, Marilyn has communicated that the accounts at issue have been closed. Plaintiff suggests Marilyn may still request such records, as South State Bank is required by law to keep them for seven years even after the accounts were closed. (DN 251, at PageID # 3845). Plaintiff contends these financial records are imperative to proving her claims against Marilyn, who Plaintiff believes received ill-gotten trust funds, and against several entity-Defendants, who she alleges disregarded a "financial need requirement" when approving trust principal distributions to Marilyn and Paul Eitel, Jr. (*Id.* at PageID # 3843, 3845). The parties disagree as to whether the trust(s) included such a need requirement, and it is not for the undersigned to interpret the language of the trusts. But even if Plaintiff's interpretation proves correct, the financial records requested go far beyond what would be necessary to determine whether the disbursements made were proper. Rather than broad access to Marilyn's bank records, the documents and information South State considered before disbursing trust funds would show whether it accounted for financial need.[6] Again, this information has already been provided to Plaintiff and she has not demonstrated a need for additional access to Marilyn's financial records.

Accordingly, Plaintiff's Motion to Compel (DN 251) is **DENIED**.

### iii.  Plaintiff's Motion to Compel and for Sanctions Against PNC Bank

Plaintiff next filed a Motion to Compel PNC to produce documents, a deposition witness, and information responsive to her 30(b)(6) Notice and Subpoena Duces Tecum. (DN 252, at PageID # 3867). Plaintiff also requests sanctions against PNC for waiting until the day before its scheduled deposition to seek a protective order. (*Id.*). In response, PNC first notes that the issues addressed in Plaintiff's motion were briefed in PNC's Motion for Protective Order, which Plaintiff "never bothered to oppose." (DN 262, at PageID # 4978). PNC also argues sanctions would be

---

[6] For emphasis, the Court here makes no statement regarding how the language of the trust(s) should be interpreted.

improper here because its Motion for Protective Order was pending on the noticed deposition date. (*Id.* at PageID # 4981).

As an initial matter, the Court will note that the substantive issues presented by Plaintiff have been addressed in Section II.A., which granted in part and denied in part PNC's Motion for Protective Order (DN 227). The Court will therefore deny her substantive requests as moot and address only her request for sanctions.

The Court may order sanctions if "a party or a party's officer, director, or managing agent—or a person designated under Rule 30(b)(6) or 31(a)(4)—fails, after being served with proper notice, to appear for that person's deposition. . . [.]" Fed. R. Civ. P. 37(d)(1)(A)(i). Rule 37(d) further provides that "[a] failure described in Rule 37(d)(1)(A) is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order under Rule 26(c)." Fed. R. Civ. P. 37(d)(2). PNC filed its Motion for Protective Order on December 5, 2021, one day before its scheduled deposition. Moreover, PNC attempted to confer with Plaintiff on December 2, 2021 and December 3, 2021, objecting to the deposition topics and alerting counsel of a scheduling conflict before filing the motion. (DN 227, at PageID # 2599). Plaintiff disregarded this and told PNC's counsel, "I fully intend to move forward with the deposition of your designee on Monday Dec. 6th as noticed." (*Id.*). Plaintiff knew as soon as December 2, 2022, four days before the scheduled deposition, that PNC objected to the Notice as served. Any travel expenses or attorney's fees incurred as a result of Plaintiff's counsel attempting to move forward with the deposition despite this knowledge was entirely avoidable. Issuing sanctions would be inappropriate here and the Court declines to do so.

Accordingly, Plaintiff's Motion to Compel (DN 252) is **DENIED** as moot in light of the Court's prior ruling on PNC's Motion for Protective Order (DN 227) and Plaintiff's request for sanctions is **DENIED**.

### iv.  Plaintiff's Motion to Compel South State Advisory's 30(b)(6) Deposition

Plaintiff next requests that the Court order Defendant South State Advisory, Inc. to produce documents, a deposition witness, and information responsive to her 30(b)(6) Notice and Subpoena Duces Tecum. (DN 253, at PageID # 3882). South State Advisory objects to Plaintiff's 30(b)(6) requests because they seek testimony and information regarding trust administration, which it claims it did not do, and on matters which it has no knowledge. (DN 261, at PageID # 4929). South State Advisory attests that it is a separate and distinct corporate entity from South State Bank, the trustee since 2003, and that it did not provide any services in connection with the trusts before 2019.[7] (*Id.*). Thus, South State Advisory suggests its discovery obligations should be limited to the subject of Plaintiff's claims against it, which involve South State Advisory's investment of trust assets beginning in 2019. (*Id.* at PageID # 4928).

South State Advisory does not object to a large number of Plaintiff's deposition topics. The following areas of examination are in dispute:

> 2. Communications between SSA and [Paul Eitel,] Jr. regarding any account, other than the Trusts, managed by SSA.
> 3. Communications between SSA and Marilyn regarding any account, other than the Trusts, managed by SSA.
> . . .
> 8. Communications between SSA and any other unaffiliated financial institution regarding accounts held by or for the benefit of [Paul Eitel,] Jr.
> 9. Communications between SSA and any other unaffiliated financial institution regarding accounts held by or for the benefit of Marilyn.
> . . .

---

[7] Beginning in 2019, South State Advisory claims it began providing investment advisory services to South State Bank in connection with South State Bank's administration of the trusts but maintains that it was never directly involved in trust administration. (*Id.*).

13

16. SSA policies on determining choice of law governing trusts from 2010 to 2021.

. . .

22. All interpretations of the Trusts' terms as received by, acquired by, or on behalf of SSA in relationship to SSA's duties to the Trusts and the Trusts' beneficiaries.

. . .

33. SSA mailers, periodicals, or other material relating to SSA operations as sent to SSA clients or prospective clients.

. . .

36. SSA employees, members, agents, or personnel on the trust committee at SSB from 2010 to 2021.

. . .

39. Accounts existing at SSA from 2010 through the present, held, controlled, or for the benefit of Marilyn.

South State Advisory attests that it was not involved with the subject trusts prior to 2019, and that it was never involved in trust administration. (DN 261, at PageID # 4928, 4927). Plaintiff suggests this assertion is false, as statements produced by South State Bank disclose South State Advisory as an investment advisor to the trusts. (DN 253, at PageID # 3886). Plaintiff also contends that Minis & Company's ("Minis'") involvement with the trusts necessarily implicates South State Advisory, which acquired Minis in 2018. (*Id.*).

District Courts have held that "a parent corporation has a sufficient degree of ownership and control over a wholly-owned subsidiary that it must be deemed to have control over documents located with that subsidiary." *Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, No. 01 CIV. 3016-AGS-HB, 2002 WL 1835439, at *4 (S.D.N.Y. Aug. 8, 2002); *see also United States v. International Union of Petroleum and Indus. Workers, AFL–CIO*, 870 F.2d 1450, 1452 (9th Cir. 1989) ("A corporation must produce documents possessed by a subsidiary that the parent corporation owns or wholly controls."). It follows that "the same principle . . . applied to interrogatories and document requests should also be applied to determine the scope of a party's obligation in responding to a Rule 30(b)(6) notice of deposition." *Twentieth Century Fox Film Corp.*, 2002 WL 1835439, at *4. Even so, Plaintiff cites to no authority, and the Court knows of

14

none, that would require a parent company to produce documents or respond under Rule 30(b)(6) regarding actions taken by the subsidiary prior to acquisition by the parent.

Accordingly, South State Advisory need not prepare its designee to testify to actions taken by Minis or its employees prior to its acquisition of Minis in 2018. Having reviewed South State Advisory's proposed alternative topics, the Court agrees that they are more appropriately tailored and will allow Plaintiff to explore the following:

> Topic 2: Communications between South State Advisory and Paul Eitel, Jr. regarding the investment of the Trusts' assets.
> Topic 3: Communications between South State Advisory and Marilyn Eitel regarding the investment of the Trusts' assets.
> . . .
> Topics 8 and 9: Communications between South State Advisory and any other unaffiliated financial institution regarding the investment of the Trusts' assets.
> . . .
> Topic 22: South State Advisory's understanding of the Trusts' interpretation to the extent it considered such interpretation in providing investment advisory services to South State Bank in connection with South State Bank's administration of the Trusts. In addition, all interpretations of the Trusts' terms as received by, acquired by, or on behalf of South State Bank, excluding those received via attorney-client privileged communications and/or work product as part of Case Nos. 16-P-4453, 16-P-4454, and 20-P-615 in the Jefferson District Court (Probate Division) and subsequent appeals.

Topics 16, 33, and 36 are overbroad and appear largely irrelevant, and Plaintiff's Motion includes no support as to why the information requested is relevant and proportional to the needs of the case. Without any developed argument as to these topics, the Court will not allow Plaintiff to explore them in South State Advisory's deposition. Lastly, consistent with other directives in this Order, the Court finds Plaintiff's broad requests for Marilyn's personal financial information irrelevant and overreaching. As such, South State Advisory need not prepare its designee to testify as to topic 39.

Plaintiff's notice also included the following subpoena duces tecum requesting the production of documents:

Request for Production No. 1: Produce all SSA inter-office communications or memorandums regarding the Trusts, [Paul Eitel,] Jr., or Marilyn.

Request for Production No. 2: Produce all SSA inter-office communications or memorandums regarding testator/testatrix intent relative to the Marilyn Casey Eitel Trust Under Agreement dated 10/30/2003.

Request for Production No. 3: Produce all inter-office SSA communications regarding non-compliance with trust management policies in relationship to the Trusts as defined herein.

Request for Production No. 4: Produce all inter-office SSA communications regarding non-compliance with trust management policies, SEC regulations, or any state or federal statute or regulation in relationship to the Trusts as defined herein.

Request for Production No. 5: Produce all inter-office SSA communications regarding non-compliance with trust management policies, SEC regulations, or any state or federal statute or regulation in relationship to the Trusts as defined, from 2013 to the present.

Request for Production No. 6: Produce all SSA inter-office communications or memorandums regarding meetings with [Paul Eitel,] Jr. and/or Marilyn over the phone or in-person.

Request for Production No. 7: Produce all SSA contracts with SSB, including contracts between Minis & Company, Inc. and SSB or between Minis and Company and SSB.

South State Advisory suggests these requests attempt to improperly substitute Rule 34 discovery requests with those appropriate under 30(b)(2). (DN 261, at PageID # 4944). While the Court finds several of these document requests irrelevant or overbroad, others are appropriate companion requests plainly related to the deposition topics. Accordingly, South State Advisory must produce documents responsive to Request for Production Nos. 1–3 and 6, if such documents exist, for the period 2018 to present. South State Advisory need not provide documents responsive to Request Nos. 4, 5, or 7.

Accordingly, Plaintiff's Motion to Compel (DN 253) is **GRANTED** in part and **DENIED** in part.

## v. Plaintiff's Motion to Compel Defendant Wells Fargo
Bank's 30(b)(6) Deposition

Plaintiff submitted a Motion to Compel Defendant Wells Fargo Bank to produce documents, a deposition witness, and information responsive to her 30(b)(6) Notice and Subpoena

Duces Tecum. (DN 254, at PageID # 3912). Plaintiff positions that Wells Fargo must prepare its corporate designee to testify as to all topics in her notice or admit a lack of corporate knowledge where necessary. (*Id.* at PageID # 3915). Moreover, Plaintiff requests that the Court bar Wells Fargo from presenting evidence at trial on topics for which it claims to have no knowledge or available witnesses. (*Id.* at PageID # 3916). Wells Fargo states it has interviewed several individuals, including the former employees Plaintiff identified as having firsthand knowledge of the trusts, but many of those interviewed cannot recall specifics regarding the trusts given the significant passage of time. (DN 259, at PageID # 4784–86). Wells Fargo confirms it is prepared to move forward with a deposition once the topics are appropriately tailored. (*Id.* at PageID # 4784).

Plaintiff outlined the following areas of examination for Wells Fargo's deposition:

1. Communications between WFB and beneficiary [Paul Eitel,] Jr. from 1991 through 2004.
2. Communications between WFB and beneficiary [Plaintiff] from 1993 through 2004 regarding the Trusts.
3. Communications between WFB and beneficiary Paul T. Eitel, III from 1993 through 2004 regarding the Trusts.
4. Communications between WFB and Marilyn from 1993 through 2004 regarding any trust.
5. Communications between WFB and beneficiary Mary C. Eitel regarding the Trusts from 1993 through 2004.
6. WFB policies on trust beneficiary communications from 1993 through 2004.
7. Titling of the Trusts by WFB upon transfer of the Trusts from PNC, including the basis for and method of determining the title to the Eitel grandparents' generation-skipping Trusts.
8. WFB's consideration of other resources available to [Paul Eitel,] Jr. when making principal distribution decisions relating to [Paul Eitel,] Jr.'s requests for principal.
9. WFB policies from 1994 to 2004 regarding the consideration of non-trust resources when deciding on whether to make principal distributions from trust accounts.
10. Documents and information received by WFB from PNC about the Trusts.
11. Documents and information WFB requested from PNC about the Trusts during the transfer to WFB.

12. Legal filings and proceedings relating to the transfer of the Trusts from PNC to WFB.

13. All interpretations of the Trusts' terms as received by, acquired by, or on behalf of WFB.

14. WFB policies on asset allocation in trust accounts from 1993 to 2004.

15. WFB policies on identifying, verifying, or establishing what constitutes "need" or "requirement" for a discretionary trust distribution under trust terms and the factors reviewed in making such determination, and by whom such determination is made.

16. WFB policies on identification, establishment, verification, or investigation of ascertainable standards regarding trust accounts from 1993 through 2004.

17. Communications to WFB, by WFB, or disclosed to WFB regarding Bee's intent in the BLE TUW.

18. Communications to WFB, by WFB, or disclosed to WFB regarding [Paul Eitel,] Sr.'s intent in the PTE TUW or the PTE TUA.

19. Communications between PNC and WFB regarding the Trusts.

20. WFB policies on beneficiary input and control of investment decisions in trust accounts from 1993 to 2004.

21. Extent of [Paul Eitel,] Jr.'s input and control of investment decisions for the Trusts from 1993 to 2004.

22. WFB policies on disclosure of testator/testatrix intent, or trustee interpretation thereof, to beneficiaries for trust accounts held or administered by WFB from 1993 to 2004.

23. WFB policies on trust transfers from other financial institutions from 1993 to 2004.

24. WFB policies on discretionary trust distributions including approval process, pre-approval investigation, pre and post approval verification, and disclosure of distributions to beneficiaries who are not receiving distributions.

25. WFB policies on trust department hiring, including qualifications required from 1993 to 2004.

26. WFB policies regarding disputes between beneficiaries and WFB on administration of trusts.

27. WFB policies from 1993 to 2004 on methods of determining apportionment of the costs of administration to principal versus income.

28. WFB methods of securities research utilized by WFB from 1993 to 2004.

29. WFB document retention policies from 1993 to 2004.

30. Current WFB document retention policies regarding documents previously held by First Union Corporation or Wachovia Corporation or any affiliate or subsidiary of such.

31. WFB interoffice communications regarding the Trusts from 1993 to 2004.

32. Accounts existing at WFB from 1993 through 2021 held, controlled, or for the benefit of Marilyn, including accounts at Wells Fargo Advisors, LLC.

33. Accounts existing at WFB from 1993 through 2020 held, controlled or for the benefit of [Paul Eitel,] Jr., including accounts at Wells Fargo Advisors, LLC.

34. All distributions from the Trusts to any person or entity from 1993 to 2004.

18

35. WFB policies on maintaining impartiality between trust beneficiaries which have more than one beneficiary from 1993 to 2004.
36. WFB policies on methods of calculating net income of the Trusts.
37. Generation skipping trust taxation prior to the 1986 IRS GST tax reform.
38. WFB involvement in lobbying for adoption of uniform trust code provisions by any state legislature in the United States including names of WFB representatives and extent of the WFB involvement in the lobbying process.
39. All documents produced by WFB in the above-captioned lawsuit.

The Court will first note that before filing her motion, Plaintiff apparently agreed to withdraw Topic No. 38. (See DN 254-3, at PageID # 3941). Similarly, Wells Fargo reports that the parties independently reached an agreement as to topics 32 and 33 after Plaintiff clarified she requests only testimony and documents relating to accounts not associated with the trusts but used in the course of Wells Fargo's management of them. (DN 259, at PageID # 4791). According to Wells Fargo, this clarification likewise wholly resolved its issues with Plaintiff's subpoena duces tecum. (*Id.*).

As for the topics that remain in dispute, the Court finds that several are clearly relevant and within Wells Fargo's ability to reasonably and adequately prepare its witness. Acceptable deposition topics include topics 6, 9, 14–16, 20, 22–30, 35, and 36, which all involve internal policies and procedures related to trust administration, and topics 7, 8, 10-13, 21, 34, and 39, which involve administration of the subject trusts generally. However, the Court agrees that topics 1–5, 17–19, and 31 are overbroad and preparing a designee to testify to them would be unduly burdensome in light of Wells Fargo's previous production of documents evidencing the communications at issue. Lastly, Plaintiff did not meet her burden to establish the relevance of topic 37 and its relevance is not clear on the face of the request. Wells Fargo need not prepare a witness to testify on that topic.

Lastly, Plaintiff's request that the Court bar Wells Fargo from introducing evidence at trial is premature and should be addressed through a motion in limine if necessary. Moreover, Plaintiff

misinterprets *W.R. Grace & Co. v. Viskase Corp.*, No. 90 C 5383, 1991 WL 211647, at *2 (N.D.

Ill. Oct. 15, 1991), which does not support her position. In *W.R. Grace*, the court explained:

> It is true that a corporation is "bound" by its Rule 30(b)(6) testimony, in the same sense that any individual deposed under Rule 30(b)(1) would be "bound" by his or her testimony. All this means is that the witness has committed to a position at a particular point in time. It does not mean that the witness has made a judicial admission that formally and finally decides an issue. Deposition testimony is simply evidence, nothing more. Evidence may be explained or contradicted. Judicial admissions, on the other hand, may not be contradicted. *Brown & Root, Inc. v. American Home Assur. Co.*, 353 F.2d 113 (5th Cir.1965), cert. denied, 384 U.S. 943 (1966). [Defendant] ignores the differences between evidentiary testimony and judicial admissions. . . If [Plaintiff's] trial witness makes a statement that contradicts a position previously taken in a Rule 30(b)(6) deposition, then [Defendant] may impeach that witness with the prior inconsistent statement.

Thus, the proper vehicle to address any inconsistencies between Wells Fargo's deposition and trial

testimony, which at this juncture is entirely speculative, would be through impeachment.

Accordingly, Plaintiff's Motion to Compel (DN 254) is **GRANTED** in part and **DENIED**

in part.

### vi.  Plaintiff's Motion to Compel South State Bank's 30(b)(6) Deposition and Production of Documents

The last among Plaintiff's Motions to Compel is her request that the Court order Defendant

South State Bank to produce documents, a deposition witness, and information responsive to her

30(b)(6) Notice and Subpoena Duces Tecum. (DN 255, at PageID # 3956). Specifically, Plaintiff

seeks documents responsive to its Request for Production No. 26, which includes "[a]ll

communications or other documents relating to [South State Bank]'s purposes, objectives, goals,

or intent in [] Jefferson District Court probate actions 16-P-4453, 16-P-4454, and 20-P-615 and

related appeals." Plaintiff explains that "[s]uch decision-making is central to [her] Abuse of

Process claims against [South State Bank] as well as the overall scope of the other claims alleged

against [South State Bank]." (*Id.* at PageID # 3962). Plaintiff also seeks to depose South State

Bank's designee about these communications and documents, as well as about financial activity of Paul Eitel, Jr. and Marilyn Eitel. (*Id.* at PageID # 3968–70).

South State Bank responds that the requested discovery concerns issues that are irrelevant to Plaintiff's claims against it and documents and communications protected by the attorney-client privilege. (DN 260, at PageID # 4806, 4812). The following summarizes relevant background information and South State's position on the Jefferson District Court probate actions.

The provisions of Kentucky's Uniform Trust Code establish a process whereby trustees may resolve any disputes over the administration of a trust upon its termination. *See* KRS § 386B.8-180. This procedure permits a trustee to notify the beneficiaries of the trust's termination, and in doing so, to provide a proposed distribution of the trust's assets and five years' worth of accountings. KRS § 386B.8-180(1)(a). A beneficiary then has forty-five days in which to object to any action or omission of the trustee. KRS § 386B.8-180(1)(b). Upon receiving such objection, the trustee may ask a Kentucky district court to resolve the dispute and charge the expense of commencing such a proceeding to the trust. KRS 386B.8-180(1)(b)(1).

Two of the trusts at issue terminated upon Paul Eitel, Jr.'s death. Consequently, when he died in 2018, South State Bank followed this process. Through its attorney, South State Bank notified the surviving children, Plaintiff and her brother, Paul Eitel III, of the trusts' termination and provided them the information required by KRS 386B.8-180(1). In response, Plaintiff reiterated previous objections to South State Bank's administration of the trusts and its proposed distributions. Accordingly, South State Bank filed motions in two Kentucky probate proceedings to resolve Plaintiff's objections, terminate the trusts, and distribute their assets.

The Jefferson District Court ultimately resolved Plaintiff's objections in South State Bank's favor, holding that South State Bank had complied with KRS 386B.8-180 in filing the two

proceedings and that it had "properly administered the Trust[s] according to [their] terms and satisfied its fiduciary duties to the Trust beneficiaries." *In re: Berenice L. Eitel Trust U/W FBO Paul T. Eitel, Jr.*, Case No. 16-P-004453 (Feb. 7, 2020 Order), Jefferson District Court; *In re: Paul T. Eitel, Sr. Trust U/W FBO Paul Eitel, Jr.*, Case No. 16-P-004454, Jefferson District Court (Feb. 7, 2020 Order). The Jefferson District Court further held that, "[p]ursuant to KRS 386B.8-180, the expenses of commencing this proceeding, including costs and attorney's fees, are charged to and paid from the Trust[s]." *Id.*

The third trust did not terminate upon Paul Eitel, Jr.'s death. Instead, its terms made his surviving spouse the net income beneficiary. Thus, South State Bank continued to administer the third trust with Marilyn Eitel as its net income beneficiary until 2019, when the value of the trust's assets fell below $100,000. Kentucky law provides that in such circumstances, where the continued administration of a trust has become uneconomical, a trustee or court may terminate the trust and distribute its remaining assets. KRS 386B.4-140. Accordingly, South State Bank petitioned the Jefferson District Court to find the trust uneconomical and approve South State Bank's termination of that trust and distribution of its assets. Plaintiff again objected to South State Bank's administration of the third trust and opposed South State Bank's plan to distribute some of the trust's remaining assets to Marilyn Eitel. Nevertheless, the Jefferson District Court approved South State Bank's motion to terminate the trust and distribute its assets and held that South State Bank had complied with KRS 386B.4-140 in determining the trust was uneconomical to administer. *See In re: Paul T. Eitel, Sr. Irrevocable Trust Under Agreement Dated May 14, 1963, FBO Paul T. Eitel, Jr.*, Case No. 20-P-000615, Jefferson District Court (Aug. 17, 2020 Order). It likewise held that South State Bank "properly administered the Trust according to its terms and satisfied its fiduciary duties to the Trust beneficiaries." *Id.*

Based on the foregoing, the purpose behind South State Bank's probate filings is clear. South State Bank followed the directives of KRS § 386B.8-180, as is appropriate when a beneficiary objects to an act or omission by the trustee. The additional information sought by Plaintiff surrounding these state actions is frivolous in light of the Jefferson District Court's orders deeming South State Bank's actions appropriate and awarding its fees. Plaintiff alleges additional information "has now come to light" that evidences "ill intent" and would have affected the state court's ruling (DN 255, at PageID # 3963), but does not elaborate further. Plaintiff has not met her burden of demonstrating a need for the requested records. Accordingly, South State Bank need not respond to Request for Production No. 26.

The Court turns next to Plaintiff's requests concerning South Sate Bank's deposition. South State Bank does not object to many of Plaintiff's deposition topics. The following areas of examination are in dispute:

> 2. Communications between WFB and SSB regarding any account held by, controlled by, or for the benefit of [Paul Eitel,] Jr. as held at WFB or SSB, excluding the Trusts. This shall explicitly include accounts held or managed by Wells Fargo Advisors, LLC for the benefit of [Paul Eitel,] Jr.
> 3. Communications between SSB and any other unaffiliated financial institution regarding accounts held by, accessed by, or for the benefit of [Paul Eitel,] Jr. or Marilyn.
> 4. Communications between WFB and SSB regarding any account held by, controlled by, or for the benefit of Marilyn as held at WFB or SSB. This shall explicitly include accounts held or managed by Wells Fargo Advisors, LLC for the benefit of Marilyn.
> . . .
> 6. Communications between SSB and any other unaffiliated financial institution regarding accounts held by or for the benefit of [Paul Eitel,] Jr.
> 7. Communications between SSB and any other unaffiliated financial institution regarding accounts held by or for the benefit of Marilyn.
> . . .
> 21. Legal filings, preparations, and proceedings relating to the actions filed by SSB in Kentucky Probate Court.
> 22. All interpretations of the Trusts' terms as received by, acquired by, or on behalf of SSB.
> . . .

23

41. Accounts existing at SSB from 2003 through the present held, controlled, or for the benefit of Marilyn.

42. Accounts existing at SSB from 2003 through 2020 held, controlled or for the benefit of [Paul Eitel,] Jr.

As with Plaintiff's requests in her Motion to Compel Marilyn's tax and bank records, the Court finds that the communications outlined above go far beyond what would be necessary to determine whether the disbursements made to Marilyn and Paul Eitel, Jr. were proper. Having reviewed South State Bank's proposed alternative topics, the Court agrees they are more appropriately tailored. Plaintiff may therefore inquire into the following deposition topics as modified:

- o Topic 2: Communications between Wells Fargo Bank and South State Bank regarding accounts held by the Trusts or financial information Paul Eitel, Jr. provided to either in connection with their administration of the Trusts.
- o Topic 3: Communications between South State Bank and any other unaffiliated financial institution regarding accounts held by the Trusts or financial information Paul Eitel, Jr. provided to South State Bank in connection with its administration of the Trusts.
- o Topic 4: Communications between Wells Fargo Bank and South State Bank regarding financial information Marilyn Eitel provided to either in connection with their administration of the Trusts.
  . . .
- o Topic 6: Communications between South State Bank and any other unaffiliated financial institution regarding accounts held by the Trusts or financial information Paul Eitel, Jr. provided to South State Bank in connection with the administration of those Trusts.
- o Topic 7: Communications between South State Bank and any other unaffiliated financial institution regarding accounts held by the Trusts or financial information Marilyn Eitel provided to South State Bank in connection with the administration of those Trusts.
  . . .
- o Topic 21: South State Bank's filing and prosecution of Civil Action No. 20-P-00615 in the Jefferson District Court (Probate Division) against Plaintiff and its subsequent appeals, excluding any attorney-client privileged communications or attorney work product received or considered in connection with any action filed against Plaintiff in Kentucky probate court
- o Topic 22: All interpretations of the Trusts' terms as received by, acquired by, or on behalf of South State Bank, excluding those received via attorney-client privileged communications and/or work product as part of Case Nos. 16-P-4453, 16-P-4454, and 20-P-615 in the Jefferson District Court (Probate Division) and subsequent appeals.
  . . .

24

- o Topic 41: Accounts existing at South State Bank from 2003 through the present that were held, controlled, or for the benefit of Marilyn Eitel that South State Bank considered in its administration of the Trusts.
- o Topic 42: Accounts existing at South State Bank from 2003 through 2020 held, controlled or for the benefit of Paul Eitel, Jr. that South State Bank considered in its administration of the Trusts.

Plaintiff's Notice also included the following subpoena duces tecum requesting the production of documents:

- o Request for Production No. 1: Produce all SSB inter-office communications or memorandums [sic] regarding testator/testatrix intent relative to the Paul T. Eitel, Jr. Revocable Living Trust dated 10/30/2003.
- o Request for Production No. 2: Produce all SSB inter-office communications or memorandums [sic] regarding testator/testatrix intent relative to the Marilyn Casey Eitel Trust Under Agreement dated 10/30/2003.
- o Request for Production No. 3: Produce all inter-office SSB communications regarding non-compliance with trust administration policies in relationship to the Trusts as defined herein.
- o Request for Production No. 4: Produce all inter-office SSB communications regarding non-compliance with trust administration policies in relationship to any trust from 2003 to the present.
- o Request for Production No. 5: Produce all SSB inter-office communications or memorandums [sic] regarding meetings with [Paul Eitel,] Jr. and/or Marilyn over the phone or in-person.
- o Request for Production No. 6: All statements of account for the Paul T. Eitel, Jr. Revocable Trust dated 10/30/2003.
- o Request for Production No. 7: All statements of account for the Marilyn Casey Eitel Trust under Agreement dated 10/30/2003.
- o Request for Production No. 8: All communications between SSB and any other unaffiliated financial institution relating to accounts held by or for the benefit of Paul T. Eitel, Jr. or Marilyn Casey Eitel, excluding communications relating to the Trusts.

South State Bank objects to these requests in their entirety and suggests Plaintiff is attempting to improperly substitute Rule 34 discovery requests with those appropriate under 30(b)(2). (DN 260, at PageID # 4827). While the Court finds several of these document requests irrelevant or overbroad, others are appropriate companion requests clearly related to the deposition topics. Accordingly, South State Bank must produce documents responsive to Request for Production Nos. 1, 2, 3, and 5. It need not respond to Request for Production Nos. 4, 6, 7, or 8.

25

Accordingly, Plaintiff's Motion to Compel (DN 255) is **GRANTED** in part and **DENIED** in part.

### C.  Plaintiff's Second Motion to Amend Scheduling Order

On December 31, 2021, Plaintiff tendered her Second Motion to Amend asking the Court to extend the discovery deadlines to allow for depositions, third-party and expert discovery, and possible supplementary pleadings. (DN 233, at PageID # 3054). Defendants Marilyn Casey Eitel (DN 236), South State Bank and South State Advisory (DN 238), and PNC (DN 240) each responded in opposition. Defendant Wells Fargo does not oppose amending the scheduling order but objects to Plaintiff's proposed deadlines as prejudicially reducing its time to produce expert disclosures. (DN 239, at PageID # 3286). Plaintiff did not file a reply.

Federal Rule of Civil Procedure 16(b)(4) states that a scheduling order may only be modified "for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). In evaluating whether good cause exists, "[t]he primary measure is the moving party's diligence in attempting to meet the case management order's requirements." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (quoting *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001)) (add'l citations omitted). Another relevant consideration is possible prejudice to the party opposing the modification. *Id.*

The Court's present rulings on the parties' various discovery motions necessitates amendment of the scheduling order to some extent. But the Court will emphasize, as it has in conferences with the parties, that it is not inclined to continue extending the deadlines in this case. The Court is particularly troubled by Plaintiff's delay in addressing several of the deficiencies she complains of in her motions. For example, Defendant Marilyn Eitel noted Plaintiff waited several months before complaining of deficiencies in Marilyn's May 17, 2021 discovery responses. Other

Defendants expressed similar frustration with Plaintiff's dilatoriness during the January 13, 2022 status conference. (*See* DN 241, at PageID # 3382) ("Counsel for the Defendants each expressed opposition to an extension and indicated that Plaintiff's own actions have caused the delays in this case."). The Court is therefore inclined to extend the discovery deadlines only long enough to accommodate the directives in this Order.

Accordingly, Plaintiff's Second Motion to Amend Scheduling Order (DN 233) is **GRANTED** in part and **DENIED** in part. Fact discovery shall be completed by May 10, 2022. Identification of experts by Plaintiff shall be done no later than May 31, 2022, and identification of experts by Defendants shall be done no later than July 1, 2022. All expert discovery shall be completed by August 15, 2022, and the parties shall at that time file a joint status report with the Court that includes their positions on mediation. Dispositive motions are now due by September 15, 2022. The final pretrial conference set for January 24, 2023 is **RESCHEDULED** to **February 21, 2023** at **2:30 p.m.** The jury trial set for February 13, 2023 is likewise **RESCHEDULED** to **March 20, 2023** at **9:30 a.m.**

<u>ORDER</u>

Based on the foregoing, Defendant PNC Bank's Motion for Protective Order (DN 227) is **GRANTED** in part and **DENIED** in part to the extent outlined above. Defendants South State Advisory and South State Bank's Motion to Compel (DN 250) is likewise **GRANTED** in part and **DENIED** in part. Plaintiff's Motions to Compel concerning Marilyn Eitel (DN 251) and PNC Bank (DN 252) are **DENIED**. Plaintiff's Motions to Compel concerning South State Advisory (DN 253), Wells Fargo Bank (DN 254), and South State Bank (DN 255) are **GRANTED** in part and **DENIED** in part to the extent outlined above. Lastly, Plaintiff's Second Motion to Amend

Scheduling Order (DN 233) is **GRANTED** in part and **DENIED** in part to the extent outlined above.

Regina S. Edwards, Magistrate Judge

United States District Court

Copies:        Counsel of Record

March 23, 2022