UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

MARY EITEL                                                                    Plaintiff

v.                                                        Civil Action No. 3:20-cv-12-RGJ

PNC BANK, N.A. ET AL                                                     Defendants

**MEMORANDUM OPINION & ORDER**

Defendants Wells Fargo Bank, N.A. ("Wells Fargo"), Marilyn Casey Eitel ("Marilyn"),

PNC Bank, N.A. ("PNC"), South State Bank, N.A. ("South State Bank"), and South State

Advisory, Inc. ("South State Advisory") move for summary judgment on Plaintiff Mary Eitel's

("Plaintiff") claims against them in the Second Amended Complaint. [DE 232, 256, 321, 324, 325,

326].[1] Plaintiff responded to Wells Fargo's, Marylin's, and PNC's motions. [DE 243, 265, 349,

358].[2] Wells Fargo, Marylin, and PNC replied. [DE 248, 268, 357, 371]. Plaintiff did not respond

to South State Bank's or South State Advisory's motions for summary judgment. [DE 270, Notice].

South State Advisory, South State Bank, Wells Fargo, PNC, and Plaintiff move to exclude expert

testimony. [DE 320, 323, 327, 329, 330]. Plaintiff moves the Court to reconsider its previous order

as it pertains to disclosure of privileged communications. [DE 341]. For the reasons below, the

Court grants Wells Fargo's, Marilyn's, and PNC's motions for summary judgment, dismisses

---

[1] PNC, Wells Fargo, and Marylin attached memorandums of law in support of their motions for summary judgment. [DE 232-22, DE 256-1]. The Joint Local Rules for the Eastern and Western Districts of Kentucky contemplate a single, unified motion and memorandum. *See* Local Rule 7.1. Going forward, Counsel is advised to file a unified motion.

[2] The Court previously granted Plaintiff's motion to defer the Court's ruling on Wells Fargo's and Marylin's motions for summary judgment pending the completion of discovery. [DE 339]. Plaintiff was given until November 2, 2022, to file any supplement to Wells Fargo's motion for summary judgment based on the statute of limitations [DE 232]. That time was later extended by the Court to November 16, 2022, and then again to November 29, 2022. [DE 355, DE 367]. Plaintiff did not file any supplement and thus the Court's review of Wells Fargo's first motion for summary judgment [DE 232] is limited to the Plaintiff's original response [DE 243] and Wells Fargo's reply [DE 248].

Plaintiff's claims against South State Bank and South State Advisory as abandoned, and denies all other motions as moot.

# I. DISCUSSION

The Court addresses the parties' motions below in different order than filed.

## A. Facts

Plaintiff alleges that Defendants have denied her rightful benefits in three trusts created by her paternal grandparents, Paul T. Eitel, Sr. ("Senior") and Bernice L. Eitel ("Bernice"). Senior was president of Porter Paint Company. [DE 104, Sec. Am. Compl, ¶ 50]. Senior died in 1970 and Berenice died in 1977. [DE Sec. Am. Compl, ¶ 50]. Senior's son, Paul T. Eitel, Jr. ("Junior") was vice president of Porter Paint and retired in 1977 at age 50. [DE 256-2, Marylin Dep. at 58[3], DE 232-4, Pl. Dep. at 211]. Plaintiff's parents, Junior, and Mary C. Eitel, divorced in 1982. In 1986, Junior married Marilyn. [DE 232-4, Pl. Dep. at 34]. Junior and Marylin were married 32 years and Junior died on November 23, 2018. [DE 232-4 at 17]. Junior paid $36,000 per year in alimony to Mary C. Eitel from 1982 until 2007 when she died. [DE 232-4, Pl. Dep. at 34, 137].

### 1. The testamentary trusts—Senior's Trust Under Will and Bernice's Trust Under Will

The first trust at issue was created by Senior: the 1968 Paul T. Eitel, Sr. Trust Under Will ("Senior's Trust Under Will") [DE 23-2; DE 90-1 at 1255; DE 232-1]. The second trust was created by Berenice: the 1977 Berenice L. Eitel Trust Under Will ("Berenice's Trust Under Will") [DE 23-3; DE 90-1 at 1257; DE 232-2]. Both Senior's Trust Under Will and Berenice's Trust Under Will paid income to Junior during his lifetime. [DE 232-1 at 2618-19, II(3)(g); DE 232-2 at 2628-29, Item VII(1)]. These trusts permitted discretionary distributions of trust principal to Junior

---

[3]When the Court cites deposition testimony, it cited the deposition page number, rather than the PAGEID#. Otherwise, page citations are to PAGEID#s.

for his health, maintenance, and welfare. Senior's Trust Under Agreement specifically allowed principal distributions to Junior "when required for health, maintenance, education, general welfare or comfort of such income beneficiary or his issue, as determined by the Trustee in its sole discretion." [DE 232-1, II(3)(g); DE 232-2, VII(2), DE 232-4, Pl. Dep. at 15:5-19.]. Bernice's Trust Under Will authorized payment to Junior of "such portion of the corpus of the trust, as [the trustee] may consider necessary, as determined in its discretion for their health and maintenance or the health, maintenance or education of their issue." [DE 232-2, § VII(3); DE 232-4, Pl. Dep. 23:9-18].

Such encroachments were limited by the agreement of the Advisory Committee to the Trust. [DE 232-1, Item VI, DE 232-2, Item X]. Like the Advisory Committee to Senior's Trust Under Agreement, Senior's Trust Under Will appointed Berenice as the Advisor to the Trustee during her life, and, after her death, appointed Junior and Helen to serve as joint advisors. *Id.* Berenice's Trust Under Will appointed Junior as Advisor to the trust, and after his death, appointed Mary C. Eitel, Plaintiff's mother, and if there is no Advisor then acting, the Trustee would exercise its own discretion. [DE 232-2, Item X].  Both trusts provide that the "Trustee shall be fully protected in failing to take any action not concurred in by the Advisor . . ." [DE 232-1, Item VI, DE 232-2, Item X].  Berenice's Trust under Will provided that the Trustee could resign and appoint a successor trustee and such change could be made by the acting Advisor, if any, otherwise by the concurrence of all income beneficiaries who had attained majority and the guardians of any income beneficiaries who had not obtained majority. [DE 232-4, Item XI]. Upon Junior's death, each testamentary trust distributed remaining assets equally to Junior's then-living children.

2.   The inter-vivos trust—Senior's Trust Under Agreement

The third trust is an inter-vivos trust created by Senior: the 1963 Paul T. Eitel, Sr. Trust Agreement ("Senior's Trust Under Agreement") [DE 232-3; DE 90-1 at 1245].   Senior's Trust Under Agreement paid income to Plaintiff's grandmother, Berenice, during her lifetime. [*Id.*] Upon Berenice's death, the trust required the remaining principal be divided equally into separate trusts to benefit Senior's then-living children "and their families." [*Id.*]  At the time of Berenice's death in 1977, Senior had two surviving children: Junior and Helen Rollins.  Plaintiff was twenty years old for when Berenice died.  [DE 90-1 at 1249].

Senior's Trust Under Agreement required that the income of the trust created for Junior's benefit be paid to him during his lifetime. [DE 90-1 at 1255]. Like Senior's Trust Under Will and Bernice's Trust Under Will above, Senior's Trust Under Agreement also entitled the trustee to use "some portion of the fund or funds for the education . . . or the maintenance in health and reasonable comfort of the income beneficiary, or his or her issue . . . ." including Junior. [DE 232-3, § V; DE 232-4, Pl. Dep. 30:4-15]. This power was subject to approval by the Advisory Committee unless the power was for the benefit of the Advisory Committee or the Advisory Committee's issue. [*Id.* Item IX]. The Advisory Committee consisted of a single individual, in the following succession: first, Paul Eitel Sr. was the sole member of the Advisory Committee; then, following his death, Berenice Eitel would become the sole member of the Advisory Committee; next, Junior would assume the role as the sole member of the Advisory Committee; and lastly, Helen C. Rollins would occupy that role. *Id*. The Trustee had to confer and obtain the approval of the Advisory Committee for sale of Trust property and investment and reinvestment of funds. The Trust stated, "the approval of the Advisory Committee covering the above relieves the Trustee from *any* liability or responsibility for having acted in accordance with such approval." *Id.*

4

Senior's Trust Under Agreement provided that the Advisory Committee to the Trust had the right at any time to remove the Trustee and appoint a successor Trustee as long as such successor Trustee was a trust company or bank possessing trust powers having a combined capital and surplus of not fewer than three million dollars. [DE 232-3, Item VI]. The parties dispute what should happen under this trust upon Junior's death. Plaintiff argues that upon Junior's death the assets of the trust are to be distributed to Junior's then-living issue.[4] South State Bank argues that upon the death of Junior, his then-living spouse, Marilyn, was to continue to receive income and upon her death, the assets of his trust were to be distributed "per stirpes" to the then-living "issue" of Junior.

3. <u>Administration of the Trusts</u>

The Court will refer collectively to Senior's Trust Under Will, Bernice's Trust Under Will, and Senior's Trust Under Agreement as the "the Trusts."  Otherwise, the Court will refer to the trusts individually.

a. <u>1963 to 1994—PNC</u>

The Trusts were administered by PNC Banks' predecessors-in-interests, First Kentucky Trusts, and First National Bank from 1963 to 1994. [DE 326 at 8625]. As early as May 1981, FKT directed trades for the Trusts through Plaintiff, who was a stockbroker the time. [DE 232-4, Pl. Dep. at 47:12-48:5, 142:15-144:7, 147:5-8, 151:15-152:22; DE 232-6, Robert Biggs Mem. to Janice Westwood, May 20, 1981 (Pl. Dep. Ex. 27); DE 232-77, Pl. Handwritten Notes, Oct. 23,

---

[4] Plaintiff argues that the "spouse" referenced in Senior's Trust Under Agreement is not Junior's wife Marilyn. Plaintiff argues that Item IV of this trust provides that "[e]very trust created hereunder shall terminate, in any event, twenty-one (21) years after the death of the last to survive of Settlor's wife, Berenice Lawson Eitel, Settlor's children, their spouses and issue, living on the date of the execution of this agreement . . . ."  Plaintiff argues the reference to "spouse," could therefore only be to Plaintiff's mother to whom Junior was married when this trust was executed.  [DE 99, Reply at 1484, n.2].

5

1986 (Pl. Dep. Ex. 30)]. From 1983 through 1986, Plaintiff worked with Steve Van Dyke from PNC's predecessor, FKT, to pick out stocks for the Trusts. [DE 326-9, Exh. G, 1983 Van Dyke Note; DE 326-3, Pla. Dep. at 146–47]. In one of Van Dyke's notes concerning the Trusts, dated June 7, 1983, it states, "met with Paul and his daughter. Long meeting—went over every stock and [illegible]. Everything looks great." [DE 326-9, Exh. G, 1983 Van Dyke Note; DE 326-3, Pla. Dep. at 146–47, 154]. On April 30, 1984, Junior wrote a letter to Van Dyke at FKT to "confirm that all transactions, sales [and] purchases, shall be made through Mary M. Eitel, Prudential Bache," and stating that "Prudential Bache will charge only the negotiated commission rate on these transactions." [DE 326-11, Exh. I, 1984 Van Dyke Ltr.].  On October 23, 1986, Plaintiff sent a note to FKT stating, "Regarding 1st Capital Income properties, Series VIII – this investment is expected to have an average annual rate of return of 20% when the properties are sold in 1987 or so. We invested in it after attending a Prudential Bache seminar on the investment. It provides a sheltered cash flow and potential appreciation from the [illegible] estate." [DE 326-12, Exh. J, 1986 FKT Note]. Plaintiff admitted during her deposition that she wrote the 1986 FKT Note and that she addressed it to PNC because she knew them to be the trust officers of the Trusts holding the investments discussed. [DE 326-3, Pla. Dep. Exh. A, 152: 11–25; 153: 1–2].

Plaintiff testified that she received statements from PNC in 1984 and 1986. [DE 326-3, Pla. Dep. at 171–72]. Plaintiff and Junior got in a fight in the early 1980s over PNC giving either Plaintiff or Plaintiff's mother a statement. [DE 323-3, Pla. Dep. at 171].  Plaintiff testified that Junior yelled at Plaintiff and "said it was his income." *Id*. Plaintiff also testified that when Plaintiff and Junior had fights about the administration of the Trusts during that timeframe Junior would "usually first . . . start to [say] it was his money. But then he would change and say, well, it's his income." *Id*.

Marilyn testified that Junior and Plaintiff fought in the early 1990s about the Trusts. [DE 326-8, Marilyn Dep. at 423–25]. At some point before March 1990, Plaintiff became a stockbroker with White and Co. and sent a letter to PNC soliciting PNC's business for the Trusts from Prudential Bach investment accounts to White and Company. [DE 326-13, 1990 White Ltr., DE 326-3, Pla. Dep. at 155].

In 1994, Junior, as the advisor to the Trusts, transferred the Trusts from First Kentucky Trust to First Union Bank ("First Union") in Hilton Head, South Carolina [DE 232-4, Pl. Dep. at 38:24–40:2; *see also* DE 232-8-A, Removal of Trustee, July 5, 1994]. PNC as not involved with the Trusts after 1994. [DE 326-3, Pla. Dep. at 160]. Plaintiff swears via her affidavit that she was not notified that the Trusts were moved out of Kentucky. [DE 244-1 at 3702]. She also claims she was not reflected on certificates of service [DE 243 at 3393] but the documents she references and attaches are not certificates of service, but certificates of qualification that do not include, at least on the documents provided by Plaintiff, a certificate of service. [DE 243, Ex. A]. Plaintiff alleges that during this time PNC allowed improper encroachments on principal to Junior, negligently sold the Indiana farm, negligently sold the Porter Paint Stock, failed to provide information to Plaintiff, and failed to prudently invest the assets of the Trusts. [104, Sec. Am. Compl.].

### b.   1994 to 2003—Wells Fargo

First Union and Wachovia, the corporate predecessors of Wells Fargo, administered was the Trusts from 1994 to 2003. In July 2002, Plaintiff emailed Junior requesting that she "start getting trades from [his] trust officer at [Wells Fargo Bank]," as with the prior trustee, PNC. [DE 232-8-B, Pl. Email to Junior, July 18, 2002]. Plaintiff argues that she never received any communications or documents from First Union or Wachovia during this timeframe relating to the Trusts until the Trusts were being transferred to South State Bank in late 2003. [DE 243- Pla Aff.].

In 2003, Plaintiff asked Wells Fargo for account statements for the Trusts. [DE 232-4 at 138:4–9]. Junior requested that Wells Fargo only provide the Plaintiff with "the principal assets and their value." [DE 232-8-C, Aug. 25, 2003, Ltr.].  Plaintiff claims that Junior's power under the Trusts to move them at any time caused the trustees to go along with Junior's wish that information be withheld from the Plaintiff. Over Junior's objection [DE 232-8], Wells Fargo provided Plaintiff with "Statement Worksheets" for the Trusts from 2000 through 2003, showing the Trusts' principal values, asset allocations, and investment positions, along with discrete transactions, including principal and income distributions to Junior, fees charged by Wells Fargo, and taxes. [DE 232-9; DE 232-4 at 265:4–13].

Plaintiff testified that she knew in 2003 that all principal distributions to Junior by Wells Fargo were too high based on Plaintiff's knowledge of Junior's ascertainable standard of living from being his stockbroker. [DE 232-4, P. Dep. at 45:5-12; *see also id.* at 47:12–48:5 (asserting that "principal distributions were too high" based on her "father's ascertainable standard of living," about which Plaintiff had knowledge through her role as "his stockbroker"), 103:11–15 (testifying that "not one" principal distribution was proper), 104:7–15 (same), 105:1-8]. In September 2003, after bringing up Wells Fargo sharing information with Plaintiff, Junior directed Wells Fargo to transfer all three Trusts to another trustee, Savannah Bank, terminating Wells Fargo as trustee of the Trusts. [DE 232-8 at 10; DE 243 at 2].

### c.   2003 to 2020—Savannah Bank

As discussed above, South State Bank via its corporate predecessor, Savannah Bank, became the trustee of the Trusts in 2003 shortly after Wells Fargo shared documents with Plaintiff over Junior's objection. South State Bank remained trustee until the Trusts were terminated in 2020.  [DE 256 at 4189]. Plaintiff knew she was a beneficiary of the Trusts no later than December

2003. [DE 232-4 at 182–83]. Plaintiff testified she first learned that Junior was getting distributions of principal in 2003 or 2004. [DE 232-4 at 46].

Plaintiff began corresponding with Stephen Pullin of Savannah Bank, requesting monthly statements for the Trusts, identifying herself a beneficiary and stating that "beneficiaries are entitled to these reports." [DE 326-15, 2003 Ltr.].  In October 2003, based on her review of information from Wells Fargo, Plaintiff told Savannah Bank that "principal distributions [Junior] have been too high considering the terms of trusts . . . and the Uniform Principal and Income Act." [DE 232-11]. During her deposition, Plaintiff testified that in 2003 and 2004 she was concerned that Junior was receiving excessively high principal distributions from the Trust. [DE 326-3, Pl. Dep. at 47:12–25; 48:1–5]. Plaintiff testified that "the bank's [sic] required to determine my father's ascertainable standard of living before any encroachment is made," and "I knew, because I was his stockbroker," what Junior's assets and needs were. [*Id*. at 47:12–25].

In December 2003, an attorney engaged by Plaintiff wrote to Savannah bank about Plaintiff's "concerns regard the three trust of which she is a residual beneficiary," asking for quarterly statements, expressing "one of [Plaintiff's] major concerns regarding the encroachment on principal in these trusts . . ." and requesting the trust documents establishing Senior's Trust Under Agreement "of which we understand [Plaintiff] is also a residual beneficiary." [DE 232-12, DE 232-4 at 43:8–18, 140:15–21, 182:1–3]. Plaintiff also contacted Wells Fargo asking for statement. [DE 326-3 at 138]. Several months later, Plaintiff's counsel sent a second letter stating that "[m]y client continues to worry" and again seeking quarterly statements on the Trusts and the documents establishing the Senior Trust Under Agreement. [DE 232-14, Feb. 24, 2004, Ltr.], [DE 232-7, Pl. Dep. at 52-53]. In her deposition, Plaintiff testified that her main concern in February

2004 was that she "didn't think that they should be removing the principal assets every month." [DE 326-3, Pla. Dep. at 53:3–12].

Plaintiff called Stephen Pullin ("Pullin") with Savannah Bank and emailed him on May 19, 2004, stating that encroachments to Junior were excessive, erroneous, had been made by previous trusts, demanding that the principal distributions to Junior stop and stating that the Trusts' assets should have been invested differently:

> It was nice speaking with you today about the three trusts . . . As we discussed, my fears about the market being so unpredictable make me desire that the money be invested in a laddered Treasury bill, bond, note program, and [Junior] can adjust his income needs downward as everyone else on a fixed income has had to do in the past couple of years, and live off the interest plus his part-time job, pension and social security income. I still do not understand what in the world could be causing him to have such high income and principal requests. **I think one of the previous trustees erroneously began paying [Junior] too much principal, and now he and Marilyn have found they like having a very high income whether they deserve it or not. . . . Unfortunately, the consequences for the rest of us beneficiaries are devastating.** I believe the problems here need to be remedied, and I hope I am able to obtain relief. Mom, Paul and I are distressed because it appears that this money is not going to be available to us when we need it and [Junior] does not care whether it is or is not. **If things continue on the way they have for the past 27 years since Namo died, I believe this money will be all used up. I believe that all principal withdrawals should be eliminated now. I believe that there has been too much principal withdrawn in the past that was not warranted**.

[DE 232-14, Pl. Email to Pullin, May 19, 2004 (emphasis added), Pl. Dep. at 53:13–21]. On May 22, 2004, Junior wrote Plaintiff the following:

> The following is to clarify some of your statements. Your facts on the Porter Paint stock are far from accurate. And the same can be said concerning the farm land. I am not going to argue the numbers with you but yours are just not correct. The million dollar loss in 2002 & 3 was due to the collapse in stock values, as you are well aware . . .You have had an obsession about the trusts for most of your adult life and particularly in the past 17 years . . . I am well pleased with The Savannah Trust Co. and do not want to lose them. Should they cancel our account because of undue badgering, I will do as Namo did and change my will. That action will depend on your conduct.

DE 326-15, Exh. Q, May 2004 Draft and Ltr]. When questioned about the May 2004 Draft and

Letter, Plaintiff testified that she knew in 2004 that the Porter Paint stock and the Illinois farmland

had been sold and that she had at least an "inkling" then that those were bad decisions. [DE 326-

3, Pla. Dep. at 123–24]. Several months later, Plaintiff obtained the final sale figures on the sale

of the Illinois farms. [DE 326-20, Exh. R, Oct. 2004 Email]. The email responded to Plaintiff's

efforts to investigate whether the Illinois farm sales in 1990 were a good decision. [DE 326-3, Pla.

Dep. at 127]. Plaintiff's handwritten notes appear on the email comparing the price in 1991 to

2011. [DE 326-3, Pla. Dep. at 126].

In 2004, Plaintiff and her son traveled to Georgia and met with the trustee and Junior

discuss the encroachments on principal made by Wells Fargo, expressing that "no distributions

were required and necessary—the standard given in the trusts. [DE 207-7, Pl. Decl. Sept. 29, 2021,

DE 232-8-E, Email June 3, 2004]. Plaintiff's declaration states:

> In 2004 I met in person at The Savannah Bank, NA, with Stephen Pullin,
> Wiley Ellis, my son Hil Horne and my father Paul T. Eitel, Jr. to discuss his
> ascertainable standard of living, because we had just found out there were
> large encroachments made monthly at the prior trustee, Wells Fargo Bank.
> We explained that no distributions were required and necessary – the
> standard given in the trusts. He had substantial other assets outside of the
> trusts which could be used. It would be unfair to the other beneficiaries for
> these monthly asset distributions to continue.

 [DE 207-7 at ¶ 4]. Plaintiff alleges she "was trying for years to find out why Wiley Ellis was

distributing assets from the trusts every month." [DE 207-7 at ¶ 6]. Plaintiff requested funds from

the Trusts to pay her son's tuition in 2004 and the request was denied. In December 2004, Plaintiff

wrote to Pullin:

> As I told you in our last conversation several months ago, one of the reasons
> that Mom, Paul and I are alarmed is because we can now see that some
> trustee banks have been permitting Dad to drain principal out of our trusts.
> Dad has been using the principal to buy houses that he has put in his new
> wife, Marilyn's sole name. In other words, Dad has taken assets out of our

> trusts in amounts far in excess of the net income that was specified to be available, and distributed them to Marilyn so that my mother, brother and I will never see it again.

[DE 232-16 at 3017]. On February 3, 2005,  Plaintiff requested principal from the Trusts to pay her son's tuition. [DE 326-21]. As part of that request, Plaintiff wrote to Stephen Pullin:

> It's a shame that the business from the trusts has not been directed to me, because it would have alleviated my money problems. I offer all the different investments that are available. I used to get all the trades from First Kentucky Trust until my father selfishly decided that he would take the business away and give it to some unknown third party. My friends that are brokers are certainly the brokers of record for their family trusts.

*Id.*  Later in February 2005, Plaintiff again wrote Pullin stating:

> Before my father stopped speaking to me this latest time, and started avoiding my son and me at all costs, he told me that he was draining money out of the trusts for Marilyn to use . . . [h]e told me that when Marilyn was gone, if there was any money left, that 'Paul and I could have the money then.' I told Dad that was not the way the trusts were supposed to work, and it was not fair for him to take money that Namo and Granddaddy intended for Mom, Paul and me, and give it to Marilyn. believe that the banks have a fiduciary duty to Mom, Paul, and me to see to it that Dad's draining of principal, in excess of his actual income needs, is stopped. The trustee banks should not allow money-to be diverted away from us, the remainder beneficiaries . . . I believe he is setting aside much of the $11,000 monthly principal and income withdrawal for Marilyn. He already used trust money to pay for a house that he put solely in Marilyn's name. Marilyn recently sold that house for over $900,000. Dad then bought another house and put it in Marilyn's sole name. The money that Dad used to buy Marilyn a house was taken directly from trust principal that was meant to go to my brother and me.

[DE 232-17 at 3020-21].  Stephen Pullin testified that Plaintiff received annual statements showing Junior's principal encroachments in 2004 and 2005. [DE 326-23 at 147].  He testified that Plaintiff "threatened legal again from time to time." *Id.* at 150–51. After Plaintiff's requests for encroachment for her son were denied, Plaintiff sent an email dated June 1, 2005, to Stephen Pullin. In the email Plaintiff states, "The Trust under Agreement does not authorize the 'advisor' to have any veto power to override the intentions of the trust. See item V. . . it's your fault, because as

trustee, you and Savannah Bank are responsible when beneficiary interests such as mine and my son's are not protected." [DE 326-24, Exh. V, June 2005 Email].

On February 24, 2006, Junior prepared a new will that disinherited Plaintiff from receiving any "assets, proceeds, property, or benefits of any kind" from Junior's estate. [DE 256-1 at 4199 citing Marilyn Eitel Prod 001058].

Between 2004 and January 8, 2015, Plaintiff (individually and through counsel) repeatedly complained to Junior, and Savannah Bank about the Trusts' administration, including contentions that Wells Fargo made improper principal distributions to her father that were not allowed by the Trusts' terms; and was responsible for the loss of more than $1 million between 1999 and 2004. [DE 207-7; DE 232-8 at 12, 14, 16; DE 232-13; DE 232-14 at 2–3; DE. 232-15 at 2–4, 6; DE 232-16; DE 232-16; DE. 232-17; DE 232-18; *see also* DE 232-8 at 18, 20]. Before 2015, Plaintiff had more than 100 written communications with counsel relating to the Trusts or her father before January 8, 2015. [DE 232-4 at 43:8–18, 140:15–21, 182:1–3; DE 232-8 at 22–31].

In 2008, Plaintiff sought the help of the County Attorney in Savannah about Junior's withdrawals of principal from the Trusts:

> I believe there is criminal activity going on in the handling of the trusts . . . which my father transferred to savannah Bank . . . my father moved the trusts there because Mr. Ellis encourages my father to drain large amounts of principal . . . that he is not entitled to . . . my father is stealing from my brother and me . . . when my mother died 12/1/2007, my father's stopped paying $3,000. Per month in alimony to her . . . Savannah Bank has allowed father to keep withdrawing that money . . . [t]his is outrageous. In addition, my father brough life insurance to benefit his new wife, paying for it with principal drained from the trusts . . .

[DE 232-15 at 3013]. In February 2008, Plaintiff wrote to South State Bank that it failed in its "fiduciary duty" to protect her interests as a beneficiary by distributing more than just the "net income" of the Trusts to Junior.[DE 232-8-F, Pl. Email to Pullin, Feb. 25, 2008].

In a January 2014 email to Amy Peirsol of South State Bank, Plaintiff lamented the "disastrous" "past" with the Trusts and stated that based on the analysis of a "tax attorney" who provided her with "expert" and "legal advice"—that "there should never have been any principal distributions to the net income beneficiary," Junior. [DE 232-18, Pl. Email to Amy Peirsol, Jan. 24, 2014; DE 232-13, Pl. Dep. Ex. 13; DE 232-4, Pl. Dep. at 67:8–70:2]. In March 2014, Plaintiff compared the value of the Trusts in 1999 to the value of the Trusts at the end of 2013, asking South State to explain what Plaintiff contended was a 45% loss of value. [DE 232-8-G, Pl. Email to Peirsol, Mar. 19, 2014].

In January 2015, Plaintiff again argued that the Trusts had been mismanaged, discussing her father's construction of a home in Hilton Head Island, South Carolina (allegedly using funds from the Trusts), stating that principal disbursements allowed her father to exceed "his ascertainable standard" of living, and concluding as follows:

> I believe the enormous principal encroachments that your bank has arranged against our trusts are indefensible. . . .This misappropriation must be remedied immediately by replacing all the withdrawn principal funds in the trusts with the average earnings that they should have earned, in addition.

[DE 232-8-H, Pl. Email to Peirsol, Jan. 8, 2015]. In February 2015, Plaintiff argued that South State, as trustee of the Trusts, owed her "a fiduciary duty" and is "accountable" for "enormous encroachments upon principal" and failing to "take any steps to see that our assets were invested properly for growth." [DE 232-8-I, Email from Pl. to South State, Feb. 3, 2015].

Some letters and privilege log produced by Plaintiff demonstrate she had and consulted legal counsel during 2003 to 2004 and in the years that followed. [DE 232-8-J, Pl. Privilege Logs]. In 2010, Plaintiff had at least seven communications with an attorney to obtain legal advice about the Trusts, including advice about communications between trustees and beneficiaries and interpretation of the Trusts' language. [DE 232-8-J, Pl. Privilege Logs]. In 2013, Plaintiff obtained

14

legal advice from two attorneys related to the Trusts. *Id.* In 2014, she had at least 95 communications with an attorney to obtain legal advice about the Trusts, including advice about trust statements, trust investments, ascertainable standard of living, and communications between trustees and beneficiaries. [*Id.*; DE 232-19, Pl. Email to Peirsol, Feb. 1, 2014 ("I am reading over the trusts, right now, and asking my tax attorney friend about his opinion.") [DE 232-14); Ex. 4, Pl. Dep.at 71:8-19]. The next year, she had at least 11 communications with an attorney to obtain further legal advice about the Trusts. [DE 232-8-J].

### 4.   Plaintiff sues in 2020

After Junior died in 2018, the trusts were eventually closed and Plaintiff received distributions from the Trusts in the approximate amount of $560,000.  [DE 256 at 4189].  Plaintiff sued on January 8, 2020. [DE 1]. She alleges the Trusts' "assets were mismanaged and systematically depleted for the benefit of others without notice to Plaintiff. This was done contrary to the terms of the trusts and in violation of duties owed by the Defendants to Plaintiff and the law." [DE 104, Sec. Am. Compl. ¶ 1]. Plaintiff seeks about $536 million in damages that she claims the Trusts would have been worth with proper administration and management "including had critically valuable assets not been sold and had Defendants not initiated and permitted consistent and unnecessary principal encroachments." [DE 256-5]. Plaintiff complains that Porter Paint stock was sold for an improperly low price in 1982, as well as a farm or farms in Illinois.

One of Plaintiff's primary complaints is that improper distributions of principal were made to Junior. [DE 104, Sec. Am. Compl. ¶ 27].  Plaintiff testified that all principal distributions were improper and based on Junior's ascertainable standard of living. [DE 232-4 at 45].  Plaintiff testified that Junior's ascertainable standard of living was his total income of $36,000 a year when he worked for Porter Paint in the 1970s, which included a company car and he had a mortgage

payment of $276 on his house. [DE 232-4 at 47–48]. Plaintiff complains that these distributions of principal improperly funded a separate trust, the Marylin Casey Eitel Trust U/A/D 10/30/2003 ("Marilyn Trust"). [DE 104, Sec. Am. Compl. ¶ 27]. The Marylin Trust is not a party this case. Plaintiff complains that the mortgages and homeowner's association fees for the two homes where Marilyn and Junior lived were paid exclusively by the Trusts. [DE 265 at 5251]. Plaintiff also complains that Junior transferred his non-trust assets to Marilyn to create an artificial need for principal encroachments. On one instance identified in Marilyn's deposition, she helped Junior fill out an encroachment request form. [DE 265-6, Marilyn Dep. at 308-325].

### B. Standard

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the nonmoving party must produce specific facts showing a material issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "Factual differences are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion." *Bell v. City of E. Cleveland*, 125 F.3d 855 (6th Cir. 1997) (citing *Liberty Lobby*, 477 U.S. at 252).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *See Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008); *see also Adams v. Metiva*, 31 F.3d 375, 384 (6th Cir. 1994). The Court must view the evidence and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000). But the nonmoving party must do

more than show some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1); *see also Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 131–32 (6th Cir. 2014). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Liberty Lobby*, 477 U.S. at 252.

Rule 56(c)(1) requires that a "party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

On a motion for summary judgment, the Court "must determine whether (1) the statute of limitations has run and (2) whether there exists a genuine issue of material fact as to when the plaintiff's cause of action accrued." *Henry v. Norfolk S. Ry. Co.*, 605 F. App'x 508, 510 (6th Cir. 2015). "At the summary judgment stage, once the statute of limitations is raised, the Plaintiff must prove facts that would toll the statute." *Kirkwood v. Vickery*, No. 4:17-CV-00086-JHM, 2019 WL 2603334, at *3 (W.D. Ky. June 25, 2019).

**C. South State Bank's and South State Advisory's Motions for Summary Judgment [DE 324, DE 321].**

To begin with, Plaintiff did not respond to South State Bank's and South State Advisory's motions for summary judgment or motions to exclude experts. As a result, the Court considers these claims against South State Bank and South State Advisory abandoned and does not further

17

consider them in its analysis.  *See Bazinski v. JPMorgan Chase Bank, Nat. Ass'n.*, 597 F. App'x 379, 380–81 (6th Cir. 2015) (affirming dismissal where district court found several claims abandoned through plaintiff's failure to address them in response to motion to dismiss) *and Degolia v. Kenton Cty.*, 381 F. Supp. 3d 740, 759–60 (E.D. Ky. 2019) (quoting *Rouse v. Caruso*, No. 06-CV-10961-DT, 2011 WL 918327, at *18 (E.D. Mich. Feb. 18, 2011), *report and recommendation adopted*, No. 06-CV-10961, 2011 WL 893216 (E.D. Mich. Mar. 14, 2011)) ("[I]t is well understood . . . that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded").  Plaintiff's claims of Racketeering, Breach of Fiduciary Duty, Breach of Duty of Good Faith and Fair Dealing, Accounting, Negligence, Abuse of Process, and Negligence Per Se against South State Bank and Plaintiff's claim for an Accounting against South State Advisory are **DISMISSED** as abandoned.  South State Bank's and South State Advisory's motions for summary judgment and motions to exclude experts are **DENIED AS MOOT**.

### D. Remaining Motions for Summary Judgment - Wells Fargo's, Marilyn's, and PNC's Motions for Summary Judgment [DE 232, DE 325, DE 256, DE 326].

#### a. Claims at issue against Wells Fargo, Marilyn, and PNC

Plaintiff alleges five claims against Wells Fargo:  (Count 1) Racketeering in violation of 18 U.S.C. 1964(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"),(Count 2) Fraud, (Count 3) Breach of Fiduciary Duty as Trustee to Income Beneficiary of the Issue Trust, (Count 5) Breach of Duty of Good Faith and Fair Dealing, (Count 8) Accounting, and  (Count 9) Negligence. [DE 104, Pla. Sec. Am. Compl.].  Wells Fargo first moves for summary judgment arguing Plaintiff's claims are time barred. [DE 232].  Wells Fargo argues that Plaintiff had sufficient information from Wells Fargo in 2004 to trigger the statute of limitations, which all had

run by the time Plaintiff sued in 2020.  Wells Fargo also moves for summary judgment on the merits of Plaintiff's claims, arguing that Plaintiff cannot establish her claims. [DE 325].

The Plaintiff makes six claims against Marilyn as the personal representative of the estate of Paul T. Eitel, Jr.: (Count 1) RICO, (Count 2) fraud, (Count 3) breach of fiduciary duty as power of attorney for [Junior], (Count 5) breach of duty of good faith and fair dealing as power of attorney for [Junior], (Count 6) intentional interference with contract, and (Count 7) constructive trust. [DE 104, Sec. Am. Compl.].  Marilyn argues in her motion for summary judgment that these claims are barred by the applicable statute of limitations. [DE 256]. She also argues Plaintiffs RICO, fraud, and constructive trust claims fail on their merits. *Id*.  Marilyn's motion, like the motion filed by Wells Fargo and PNC, argues that the statute of limitations have run based on the Plaintiff's knowledge and statements made in 2004.

Plaintiff makes five claims against PNC: (Count 2) fraud, (Count 3) breach of fiduciary duty, (Count 5) breach of good faith and fair dealing, (Count 8) accounting, and (Count 9) negligence (Count 9).  [DE 104, Sec. Am. Compl.]. Plaintiff testified that the basis of her claims against PNC are: (1) PNC should have contacted her about her interests in the Trusts in 1970 and 1977 [DE 326-3, Pla. Dep. at 167:23–25; 168:1–3], (2) PNC should have notified her of the transfer to First Union and gotten her written permission in 1994, [*Id*. at 176:2–11], (3) PNC let [Junior] block her from receiving statements before 1994 [*Id*. at 176:12–20], (4) PNC should not have sold the Porter Paint shares and the Illinois farms, which took place before the early 1990s [*Id*. at 176:25–177:12], (5) PNC should not have permitted [Junior's] encroachments in the early 1990s [*Id*. at 179:11–13], and (6) PNC "titled the assets wrong" when it transferred them to First Union, which occurred in or before 1994 [*Id*. 179:16–25]. PNC argues all of Plaintiff's claims are barred

by their applicable statutes of limitations. [DE 326-1 at 8643].  PNC also argues these claims fail

as a matter of law. [DE 326].

> b.   RICO claims against Wells Fargo and Marilyn

The RICO statute provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). The RICO statute does not provide a statute of limitations, but the Supreme

Court has held that civil RICO actions are subject to a four-year limitations period. *Klehr v. A.O.*

*Smith Corp.*, 521 U.S. 179, 182 (1997). "[P]rivate civil [RICO]actions seek not only to compensate

victims but also to encourage those victims diligently to investigate and thereby to uncover

unlawful activity."  *Id.* at 181. The four-year limitations period begins to run "when a plaintiff

knew or should have known of his injury." *Rotella v. Wood*, 528 U.S. 549, 554 (2000); *Osborn v.*

*Griffin*, 50 F. Supp. 3d 772, 806 (E.D. Ky. 2014) ("*Rotella* thus stands for the proposition that a

plaintiff need not know all the elements required to bring a civil RICO claim to start the limitations

period running."). The accrual date is not the date of the last act, but the date on which the plaintiff

"should have known of his alleged injuries." *Hood v. United States Postal Serv.*, No. 17-1048,

2017 WL 6988055, at *2 (6th Cir. Oct. 11, 2017) (barring RICO claims when Plaintiff knew of

injury more than four years before he filed his complaint). Thus, "[a] plaintiff need only be aware

of 'storm warnings' but does not need to 'hear thunder and see lightening.'" *Sims v. Ohio Cas. Ins.*

*Co.*, 151 F. App'x 433, 436 (6th Cir. 2005) (quoting *Isaak v. Trumbull Sav. & Loan Co.*, 169 F.3d

390, 399 (6th Cir. 1999)).

This lawsuit was filed January 8, 2020, and so any RICO claim against Wells Fargo or Marilyn accruing before January 8, 2016, would be facially untimely. But Plaintiff's RICO claim accrued long before 2016. Plaintiff claims Wells Fargo, and other trustees not at issue in the present summary judgment motions, and Marilyn, engaged in a scheme where improper principal encroachments were allowed to be paid Junior by the trustees which then resulted in those monies going to Junior's wife, Marilyn. The Court has reviewed the documents and communications in the record provided by the parties during the 2003 and 2004 timeframe and after. Plaintiff was aware of her alleged injury in 2004. Plaintiff reviewed statement worksheets for the Trusts in late 2003 when they were provided by Wells Fargo, after which she was aware of the principal encroachments and was "alarmed, astounded, and mad" [DE 232-15, Ex. 15, Pl. Letter to Pullin, Aug. 3, 2004 (Pl. Dep. Ex. 34)]. After receipt of the information, she expressed the alleged misconduct of Wells Fargo Bank and Marilyn multiple times in 2003 and 2004, including through letters from her counsel to successor trustee Savannah Bank. She traveled to Georgia with her son to express her concerns in person. [DE 207-7, Pl. Decl., Sept. 29, 2021]. Plaintiff knew of this alleged injury in 2004 when she wrote to Stephen Pullin that her "Dad [Junior] has taken assets out of [the] trusts in amounts far in excess of the net income that was specified to be available, and distributed them to Marilyn so that . . . I will never see it again." [DE 232-16 at 2 (stating further that her father [Junior] "has been using the principal to buy houses that he has put in . . .Marilyn's sole name").[5] Thus, Plaintiff's RICO claim accrued in 2008, four years after she knew or should have known of her alleged injury in 2004. After reviewing the communications noted, as well as

---

[5] As detailed in the record, Plaintiff expressed similar knowledge in the years that followed. *E.g.*, [DE 232-17 at 3 (on February 2005 stating that Plaintiff's father [Junior] "used trust money to pay for a house that he put solely in Marilyn's name"); DE 232-15 at 8 (on February 2008 stating that her "father [Junior] bought life insurance to benefit [Marilyn Eitel], paying for it with principal drained from the trusts").

many others in the record, the Court does not find this a close call. Thus, Plaintiff's RICO claims against Wells Fargo and Marilyn are untimely.

The statute of limitations for a RICO claim, like most federal claims, can be paused by equitable tolling. *Rotella*, 528 U.S. at 560. "This doctrine allows a plaintiff to assert a civil RICO claim where a defendant has taken steps to conceal his existence or activities through fraud, and the plaintiff, 'without any fault or want of diligence or care on his part,' is unable to discover the injury within the limitations period." *Grange Mut. Cas. Co. v. Mack*, No. CIV.A. 6:06-555-DCR, 2009 WL 1036092, at \*5 (E.D. Ky. Apr. 17, 2009) (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946)). But equitable tolling is a narrow exception that should be "applied sparingly," *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). To equitably toll her RICO claim, Plaintiff "bear[s] the burden of demonstrating defendants' fraudulent concealment of the RICO injury and [her] own due diligence." *Osborn*, 50 F. Supp. 3d at 806–807. Equitable tolling "is not appropriate" when "a lack of due diligence" results in a substantial delay bringing a claim once facts are known to the plaintiff. *Allen v. Yukins*, 366 F.3d 396, 404 (6th Cir. 2004) (affirming dismissal of a habeas petition and declining to apply equitable tolling because of a fourteen-month delay between conviction and filing of the habeas petition); *see also Campbell*, 676 F.2d at 1128 ("A plaintiff who requests the avoidance of the[ ] [statute of limitations through tolling] owes the courts, the public, and his adversaries a duty of diligence in discovering and filing his lawsuit.") (emphasis added). And in a situation closely analogous to this case, the Seventh Circuit found it would be inappropriate to apply equitable tolling when a plaintiff waited one year to file suit after it discovered the facts that undergirded its RICO claim. *See Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc*., 782 F.3d 922, 931 (7th Cir. 2015) (quotation omitted) ("[A] plaintiff who invokes equitable tolling to suspend the statute of limitations must bring suit within

a reasonable time after he has obtained, or by due diligence could have obtained, the necessary information. Similarly, equitable estoppel, also called fraudulent concealment, applies only when plaintiffs act with reasonable diligence to discover and file their claims.").

The facts examined by the Court in the record show that Plaintiff's knowledge proves fatal to her argument for equitable tolling. Equitable tolling "allows a plaintiff to assert a civil RICO claim where a defendant has taken steps to conceal his existence or activities through fraud, and the plaintiff, 'without any fault or want of diligence or care on his part,' is *unable to discover the injury* within the limitations period." *Grange,* 2009 WL 1036092, at \*5 (quoting *Holmberg*, 327 U.S. at 397) (emphasis added). The Plaintiff cannot benefit from tolling here because she was aware of her injury. *See DeShetler*, 790 F. App'x at 672 (declining to apply equitable tolling because "Plaintiffs need not know the extent of the alleged breach of the duty of fair representation to file a claim" and "Plaintiffs' own allegations show that they should have already known that UAW acted arbitrarily") (quotation omitted); *Chapple v. Nat'l Starch & Chem. Co. & Oil*, 178 F.3d 501, 506 (7th Cir. 1999) ("[T]he tolling inquiry asks only whether the plaintiff was unable to learn of the possibility of its claim within the limitations period; it does not ask whether the plaintiff was unable to obtain solid proof.").  As discussed above, Plaintiff knew of her alleged injury caused by Wells Fargo Bank and Marilyn in 2004. Even assuming information she was entitled to was wrongfully withheld, she was not unable to discovery her injury with the limitations period. Thus, she is not entitled to equitable tolling and summary judgment is granted to Wells Fargo and Marilyn on Plaintiff's RICO claims.

c.  Supplemental Jurisdiction

Having dismissed the RICO claims, the Court, as is its duty, sua sponte considers its jurisdiction over the remaining claims, which are state law claims. *Clarke v. Mindis Metals, Inc.*,

99 F.3d 1138 (6th Cir. 1996). The statutory basis for this court's supplemental jurisdiction over state-law claims is set forth in 28 U.S.C.A. § 1367. "[D]istrict courts have broad discretion in deciding whether to exercise supplemental jurisdiction." *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 196 F.3d 617, 620 (6th Cir. 1999). Section 1367(c)(3) provides that district courts may decline to exercise supplemental jurisdiction over related state claims if "the district court has dismissed all claims over which it has original jurisdiction." When deciding to exercise supplemental jurisdiction, a court should consider the "values of judicial economy, convenience, fairness, and comity." *Gamel v. City of Cincinnati*, 625 F.3d 949, 951–52 (6th Cir. 2010) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). The balance of these interests supports exercising supplemental jurisdiction. *See Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996), *amended on denial of reh'g*, No. 95-5120, 1998 WL 117980 (6th Cir. Jan. 15, 1998) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims[.]"); *see also Cirasuola v. Westrin*, 124 F.3d 196 (6th Cir. 1997); *and Taylor v. First of Am. Bank-Wayne*, 973 F.2d 1284, 1287 (6th Cir. 1992) ("Generally, if the federal claims are dismissed before trial the state claims should be dismissed as well." (internal citations omitted)).   Accordingly, the Court's analysis continues with the rest of the issues set forth in Wells Fargo's, Marilyn's, and PNC's motions for summary judgment.

    d.  <u>Fraud</u>

     *1.  Claims against Wells Fargo and PNC*

  Plaintiff alleges fraud against Wells Fargo, Marilyn, and PNC.  The applicable statute of limitations for a fraud claim under Kentucky law is five years under KRS 413.120(11) ("An action for relief or damages on the ground of fraud or mistake."). A claim for fraud accrues when it is

discovered or should have been discovered in the exercise of reasonable diligence. *Louisville Tr. Co. v. Johns-Manville Prods. Corp.*, 580 S.W.2d 497, 501 (Ky. 1979). But under the statute of repose, KRS 413.130(3), an action for fraud must be commenced within 10 years of the fraud being perpetrated regardless of the discovery date. KRS 413.130(3) ("In an action for relief or damages for fraud or mistake . . . the action shall be commenced within ten (10) years after the time of making the contract or the perpetration of the fraud"). The U.S. Supreme Court "repeatedly has stated in broad terms that statutes of repose are not subject to equitable tolling." *California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc*., 137 S. Ct. 2042, 2050–51 (2017) (quotation marks and citations omitted); see also *CTS Corp. v. Waldburger*, 573 U.S. 1, 9 (2014). Thus, a fraud claim must be brought within 10 years of the supposed fraud "[e]ven if Plaintiffs never discovered the fraud." *Bowden v. City of Franklin, Kentucky*, 13 F. App'x 266, 275 (6th Cir. 2001).

Any fraud by Wells Fargo was committed no later than 2003 and any fraud by PNC was committed no later than 1994. Thus, the alleged actions of fraud by Wells Fargo and PNC occurred well before 2010, which is when the statute of repose would be triggered. Plaintiff claims the discovery rule and equitable estoppel [DE 349 at 10345] saved her fraud claims. But as set forth above, the statute of repose is not subject to equitable tolling. And PNC correctly cites *Hernandez v. Daniel*, where Kentucky's highest court held that the discovery rule did not save the plaintiff's fraud claim from the ten-year limitations period set forth in KRS 413.130(3). 471 S.W.2d 25 (Ky. 1971). Thus the Court grants Wells Fargo's and PNC's motions for summary judgment on Plaintiff's fraud claims as they are untimely.

### 2.  *Fraud claim against Marilyn*

The Court need not consider the statute of limitations as it relates to Plaintiff's claim against Marilyn because it fails as a matter of law. Plaintiff alleges that the Defendants had a duty to report

and inform her of material information relating to the administrations of the Trusts and that omission of material information induced her to believe any information provided was complete and that the Trusts were being administered in accordance with their terms. [DE 104, ¶ 97]. The Court interprets this claim as one for fraud by omission. *Eitel v. PNC Bank, N.A.*, No. 3:20-CV-12-RGJ, 2020 WL 6929564, at *10 (W.D. Ky. Nov. 24, 2020). To prevail on a claim of fraud by omission, or fraud based on failure to disclose a material fact, Plaintiff must prove: (1) that Marilyn had a duty to disclose that fact; (2) that Marilyn failed to disclose that fact; (3) that Marilyn's failure to disclose the material fact induced the plaintiff to act; and (d) that Plaintiff suffered actual damages. *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. App. 2003). "A duty to disclose facts is created only where a confidential or fiduciary relationship between the parties exists, or when a statute imposes such a duty, or when a [plaintiff] has partially disclosed material facts to the [counterclaimant defendant] but created the impression of full disclosure." *Id.*

Marilyn argues that Plaintiff's fraud claim against her fails because she cannot show Marilyn had a duty to disclose a material fact to her. [DE 256-1 at 4207]. Plaintiff testified that she and Marilyn did not have a relationship, and that Plaintiff never requested information from Marilyn. [DE 232-4 at 246–53]. Plaintiff does not address in her response to Marilyn's argument that she owed no duty to under Plaintiff's alleged fraud claim. Instead, Plaintiff only addresses equitable tolling and equitable estoppel in response to Marilyn's arguments about the statute of limitations. Plaintiff fails to show that for purpose of her fraud claim, she and Marilyn had a confidential relationship, that Marilyn owed Plaintiff a fiduciary duty, that a statute imposed a duty upon Marilyn in the context of this claim, or that Marilyn made a partial disclosure to Plaintiff that created a false impression of full disclosure. *Rivermont Inn*, 113 S.W.3d at 641. Plaintiff fails to

26

show that Marilyn had a duty to her applicable to her fraud claim. Therefore, Plaintiff's fraud claim against Marilyn fails as a matter of law and Marilyn's motion for summary judgment on this claim is granted.

> e. Breach of Fiduciary Duty, Negligence, Breach of Duty of Good Faith and Fair Dealing

> 1. *Claims against Wells Fargo and PNC*

The Court will first address the Plaintiff's claims against Wells Fargo and PNC, then Marilyn. An action for breach of fiduciary duty has a five-year statute of limitations. KRS 413.120(6); *Ingram v. Cates*, 74 S.W.3d 783, 787 (Ky. App. 2002). The duties owed by Wells Fargo and PNC to Plaintiff are those established through their fiduciary duties under Kentucky trust law. *See* KRS 386B.8-010 ("trustee shall administer the trust in good faith"); KRS 386B.8-040 ("trustee shall administer the trust as a prudent person would" and "shall exercise reasonable care"). Kentucky's Trust Code provides that "[a] violation by a trustee of a duty the trustee owes to a beneficiary is a breach of trust." KRS 386B.10-010.  Thus, Plaintiff's negligence and breach of duty of good faith and fair dealing claims against Wells Fargo and PNC are breach of trust claims. Plaintiff's claims for negligence and breach of duty of good faith and fair dealing against Wells Fargo and PNC are nearly duplicative of her breach of fiduciary duty claims against them. [DE 104, Sec. Am. Compl., *compare* Counts V, IX, XI with Count III].  All three of these claims are  "action[s] for an injury by a trustee to the rights of a beneficiary of a trust," which "shall be commended within five (5) years after the cause of action accrued." KRS 413.120(6); *Watkins v. Tr. Under Will of Bullitt ex rel. PNC Bank, N.A.*, No. 3:13-CV-01113-TBR, 2014 WL 4722200, at *3 (W.D. Ky. Sept. 22, 2014).  Claims for breach of fiduciary duty or negligence against a trustee "accrue immediately upon a trustee's improper action." *Watkins,* 2014 WL 4722200, at *3 (W.D. Ky. Sept. 22, 2014).

27

The Kentucky Supreme Court discussed the statutes of limitations for a breach of fiduciary duty claim against a trustee in *Middleton v. Sampey*, 522 S.W.3d 875, 878 (Ky. App. 2017).  As explained in *Middleton*, the Kentucky Legislature adopted the Uniform Trust Code in 2014 which included the enactment of two different statute of limitations (one year and five years) for breach of fiduciary duty claims against a trustee under KRS 386B.10-050:

> (1)      For the purposes of this section, a "report" is an account statement or other form of written disclosure made by the trustee to the beneficiary.
>
> (2)      A beneficiary may not commence a proceeding against a trustee for breach of trust more than one (1) year after the date the beneficiary or a representative of the beneficiary was sent a report that adequately disclosed the existence of a potential claim for breach of trust and informed the beneficiary of the time allowed for commencing a proceeding.
>
> (3)      A report adequately discloses the existence of a potential claim for breach of trust if it provides sufficient information so that the beneficiary or representative knows of the potential claim or should have inquired into its existence.
>
> (4)      If subsection (2) of this section does not apply, a judicial proceeding by a beneficiary against a trustee for breach of trust shall be commenced within five (5) years of discovery of an injury by a trustee to the rights of the beneficiary.

*Id*. But the legislature also passed KRS 386B.11-040(2) which made KRS 386B.10-050 inapplicable to claims that existed before its enactment in 2014.  *Middleton*, 522 S.W.3d at 878. As held in *Middleton*, claims arising before July 2014 remain governed by the five-year statute of limitations under KRS § 413.120(6). Here, Plaintiff's claims against PNC and Wells Fargo arose long before July 2014, and thus, the five-year statute of limitations under KRS § 413.120(6) applies to these claims. And, contrary to Plaintiff's argument, the discovery rule does not apply to breach of trust claims under KRS § 413.120(6). *Middleton*, 522 S.W.3d at 879 (declining to apply discovery rule to breach of trust claim "without statutory authority to do so" because "KRS

413.120 does not specifically extend the discovery rule to breach of trust claims");[6] *see also Roman Cath. Diocese of Covington v. Secter*, 966 S.W.2d 875, 879 (Ky. App. 2017) (citing *Rich & Rich Partnership v. Poetman Records USA, Inc*., 714 F. Supp. 2d 657, 668 (E.D. Ky. 2010) (applying Kentucky law and concluding the discovery rule is inapplicable to breach of fiduciary duty claims)). Plaintiff argues that the five-year statute of limitations with no discovery rule for her breach of fiduciary duty and trusts claims is unconstitutional. [DE 349 at 10341-43]. But Plaintiff cites no authority, nor has the Court located any, holding KRS § 413.120 or the case law cited on the lack of discovery rule unconstitutional under the U.S. or Kentucky Constitutions.

Plaintiff's claims against Wells Fargo accrued during the timeframe of 1994-2003. [DE 104, Sec. Am. Compl. ¶¶ 134, 136–37, 142–46, 207, 226, 246].  Plaintiff's claims against PNC accrued in 1994 or earlier as she testified that she believes PNC should have contacted her in the 1970s about her interest in the Trusts, that PNC should have notified her and obtained her permission when the Trusts were transferred to First Union in 1994, should not have sold the Porter Paint stock or Illinois farm in the early 1990s, and should not have let Junior prevent her from obtaining Trust statements while PNC was trustee.  [DE 326-2, Pla. Dep. at 167, 176–77, 179].

---

[6] Even if the discovery rule applied to these claims, the Court is doubtful it would apply to toll the statute of limitations under Kentucky law as Plaintiff new these two trustees may have injured her as late as 2004. *Roark v. 3M Co*., 571 F. Supp. 3d 708, 712 (E.D. Ky. 2021) (citing *Conway v. Huff*, 644 S.W.2d 333, 334 (Ky. 1982)). "[T]he discovery rule stops tolling the statute of limitations once the plaintiff knows, either actually or constructively, that the defendant 'may' have caused his injury—definitive knowledge of causation is not required." *Id*.

Thus, Plaintiff's claims of breach of fiduciary duty, negligence, and breach of the duty of good faith and fair dealing are barred by the statute of limitations.[78]

Plaintiff argues that equitable tolling, equitable estoppel, and South Carolina's borrowing statutes apply to make her breach of fiduciary duty, negligence, and breach of good faith and fair dealing claims against Wells Fargo and PNC timely. [DE 243].

### a. Equitable Tolling

Plaintiff argues equitable tolling via the fraudulent concealment statute applies. Kentucky law "equitably tolls its statute of limitations whenever the defendant's wrongful conduct prevents a plaintiff from discovering her claims." *Osborn v. Griffin*, 865 F.3d 417, 437 (6th Cir. 2017) (citing KRS § 413.190(2)). The statute provides as follows:

> (2) When a cause of action mentioned in KRS 413.090 to 413.160 accrues against **a resident of this state**, and he by absconding or concealing himself or by any other indirect means obstructs the prosecution of the action, the time of the continuance of the absence from the state or obstruction shall not be computed as any part of the period within which the action shall be commenced. But this saving shall not prevent the limitation from operating in favor of any other person not so acting, whether he is a necessary party to the action or not.

KRS § 413.190(2) (emphasis added). But Kentucky's fraudulent concealment statute only applies to "a resident of this state [Kentucky]." *Jones v. Sedgwick Claims Mgmt. Servs., Inc*., No. CV 17-

---

[7] Along with KRS 413.120(6), Plaintiff's claims are likely also untimely against Wells Fargo under KRS § 386.735 (1998), which provides that when a trustee is removed and provides a final account statement, a claim by a beneficiary must be brought within six months or three years, depending on whether there was a full disclosure. *Cecil v. Cecil*, 712 S.W.2d 353, 355 (Ky. Ct. App. 1986) (holding that termination of trust agreement "served as a complete accounting which triggered the statute of limitations under KRS 386.735"). Here, Wells Fargo provided Plaintiff with account statement worksheet for the Trusts and a final account statement.

[8] PNC argues that even if Plaintiff's breach of good faith and fair dealing claim is not construed as a breach of trust claim, such a claim is only recognized in the context of contracts and thus, the claim would still be beyond the statute of limitations as there no discovery rule and the 15-year statute of limitations for breach of contract would expire in 2009. [DE 357 at 10720].

47, 2017 WL 2785415, at *3 (E.D. Ky. June 27, 2017), *Fluke*, 306 S.W.3d at 62 n. 9 ("Statutory estoppel clearly does not apply here since Fluke [Corporation] is not a resident of Kentucky."). Thus Plaintiff's reliance on *Salmon v. Old Nat. Bank,* No. 4:08-CV-00116-JHM, 2012 WL 4213643, at *11 (W.D. Ky. Sept. 19, 2012) and *Osborn*, 865 F.3d 417, is misplaced as both cases involved applying equitable tolling under KRS 413.190 to residents of Kentucky. [DE 243, DE 349]. Wells Fargo is a national banking association and is a citizen of South Dakota with its principal place of business in South Dakota. [DE 104 Sec. Am. Compl. ¶ 8; DE Wells Fargo Ans. 127 ¶ 8], *Wachovia Bank v. Schmidt*, 546 U.S. 303, 307 (2006) (holding that a national banking association is a citizen of the state in which its main office, as in its articles of association, is located). PNC bank, like Wells Fargo, is a national banking associating and is a citizen of Delaware, where its main office is located as stated in its articles of incorporation. [DE 104, Sec. Am. Compl. ¶ 6; DE 114, PNC Ans. ¶ 6]. Because PNC is not a Kentucky resident, the equitable tolling statute simply does not apply to Plaintiff's claims against it. *Sparacino v. Shepherd Commc'ns, Inc., No.* 3:14-CV-298-JHM-CHL, 2015 WL 631240, at *6 (W.D. Ky. Feb. 12, 2015) ("Section 413.190 of the Kentucky Revised Statutes applies where the defendant is a resident of the Commonwealth of Kentucky. The statute does not apply to nonresidents of Kentucky." (citation omitted)).

*b.  Equitable Estoppel*

i.  Wells Fargo

"'Equitable estoppel is a defensive doctrine founded on the principles of fraud[.]'" *Helm Co., LLC v. Al J. Schneider Co*., Nos. 2013-CA-001192-MR, 2013-CA-001385-MR, 2014 WL 4802909, at *3 (Ky. Ct. App. Sept. 26, 2014) (quoting *Ping v. Beverly Enters., Inc*., 376 S.W.3d 581, 594 (Ky. 2012)). Proving equitable estoppel is a "heavy burden." *Id*. A viable equitable

estoppel claim must allege that the defendant made a material misrepresentation, and the plaintiff relied on that misrepresentation. *Fluke*, 306 S.W.3d at 62. To establish that the defendant made a material misrepresentation, the plaintiff must show that the defendant:

> (1) [engaged] in conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) [with] the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) [with] knowledge, actual or constructive, of the real facts.

*Id*. Further, to show that the plaintiff relied on a material misrepresentation, the plaintiff must show on its own behalf:

> (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice.

*Id*.  "[T]he equitable estoppel doctrine is reserved for truly exceptional circumstances." *Id*. at 67.

Plaintiff fails to establish the knowledge element necessary to establish equitable estoppel against either Wells Fargo. As explained above, Plaintiff knew about the principal encroachments in 2004 when she reviewed the statement worksheets provided by Wells Fargo.  [DE 232-15, Ex. 15, Pl. Letter to Pullin, Aug. 3, 2004 (Pl. Dep. Ex. 34)].  After receipt of the information, there are many communications from Plaintiff to the successor trustee (including letters from her counsel), and in-person meeting, where she expressed alleged misconduct by Wells Fargo and PNC (and Marilyn). [*see, e.g*., DE 232-15 at 2 (stating in August 2004 that [Junior] "should not be invading principal at all"); DE 232-14 at 3 (stating in May 2004 that "all principal withdrawals should be eliminated"); DE 232-18 (stating in January 2014, based on analysis by Plaintiff and her legal counsel, that "there should never have been any principal distributions"); DE 232-16 at 2 ("[Junior]

has taken assets out of [the] trusts in amounts far in excess of the net income that was specified to be available, and distributed them to Marilyn so that . . . I will never see it again"); *Id.* (stating [Junior] "has been using the principal to buy houses that he has put in . . . Marilyn's sole name"); DE 232-17 at 3 (stating in February 2005 that Plaintiff's father "used trust money to pay for a house that he put solely in Marilyn's name"); DE 232-15 at 8 (stating in February 2008 that Junior "bought life insurance to benefit [Marilyn Eitel], paying for it with principal drained from the trusts")].

Plaintiff argues her knowledge in 2004 and the years following was not sufficient as she did not know the purpose the of the principal encroachments. But this argument is not persuasive as Plaintiff's deposition testimony and her communications from that timeframe show she believed then that the encroachments were improper. [DE 232-4, Pla. Dep. at 45:5–12; *see also id.* at 61:4–18 (testifying, when discussing a December 2004 letter, that it was Plaintiff's "belief then that [Junior] should not be receiving principal at all"); *id.* at 47:12-48:5; *id.* at 103:5–15, 104:7–15, 105:1-8 (testifying that, as of October 2021, Plaintiff contends that "not one" principal distribution was proper); DE 232-15 at 2 (stating in August 2004 that her father "should not be invading principal at all"); DE 232-14 at 3 (stating in May 2004 that "all principal withdrawals should be eliminated"); DE 232-18 (stating in January 2014, based on analysis by Plaintiff and her legal counsel, that "there should never have been any principal distributions")]. Plaintiff submitted an affidavit in response to Wells Fargo's motion for summary where she alleges that "I never said I knew in 2003 that all distributions were too high . . . I had no idea what the purposes of the distributions of assets were, so I could not know if any removals were permissible as being required and necessary for his health, education or other reason." [DE 2144-1 at ¶ 3705]. The Court has reviewed Plaintiff's 2021 deposition testimony, and Plaintiff's affidavit on this point may seek to

create a factual dispute contrary to her testimony under oath, which is improper. *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony."). Aside from her deposition testimony, Plaintiff's correspondence detailed above from the 2004 timeframe shows she did not believe the encroachments were proper. And the question is not whether Plaintiff knew with certainty whether the principal encroachments were improper, the question is whether Plaintiff lacked knowledge. Under the facts in the record, Plaintiff fails to show that she lacked knowledge and the Court does not find this issue a close call. There is also no evidence that she relied on the concealment that she alleges Wells Fargo undertook and the evidence detailed above shows to the contrary.

### ii.  PNC

Plaintiff argues the statute of limitations on her claims against PNC should be equitably estopped because (1) "PNC failed to provide sufficient material information to [Plaintiff] to protect her interest," citing *Sec. Trust Co. v. Wilson*, 210 S.W.2d 336 (Ky. 1948), (2) PNC was the gatekeeper of information and Plaintiff did not have the means to acquire the information, (3) Plaintiff presumed PNC met its duties and PNC's actions induced her to inaction, and (4) she relied on PNC's misrepresentation in 2015 that documents did not exist. [DE 349 at 10346]. Plaintiff argues that there is no evidence in PNC's large document production that statements or information was shared with Plaintiff except for a few instances. PNC counters that this lack of evidence results from decades that have passed and is not evidence that PNC did not keep Plaintiff informed.

PNC argues that the following knowledge prevents Plaintiff from showing equitable estoppel or the discovery rule from applying and that she had this knowledge by 2004 at the latest: (1) Plaintiff knew about the Porter Paint stock sale in the early 1980s because of her status as a

stockbroker and based on her deposition testimony, [DE 357 at 10714], (2) Plaintiff testified that she concerned in the early 1980s about the amount of money being paid to [Junior] and that this was corroborated by Marylin's testimony [DE 357 at 10714], (3) Plaintiff's correspondence with Pullin at Savannah Bank in 2003 and 2004 and hiring of lawyer show her concern over the management of the Trusts, including her concern that principle distributions were improper and she was not receiving monthly statements. [DE 357 at 10715]. PNC points to a May 19, 2004, letter from Plaintiff to Pullin that states, "I think one of the previous trustees erroneously began paying [Junior] too much principal . . . If things continue on the way they have for the past 27 years since Namo died, I believe this money will be all used up . . . I believe that there has been too much principal withdrawn in the past that was not warranted." [DE 357 at 10715] citing email and Plaintiff's deposition. PNC argues this letter shows Plaintiff believed PNC paid [Junior] too much principal, the consequences of that error, and that if the pattern with began with PNC continued, all the money would be gone. *Id.*  PNC also cited a May 22, 2004, letter from Junior to Plaintiff that shows Plaintiff knew of the Porter Pain stock sale and Illinois Farmland Sale. PNC argues Plaintiff's threats of legal action in 2004 and 2005 show her knowledge. *Id.*

The Court has reviewed evidence submitted in the record by the parties at length, much of which is recited above in the background and agrees with PNC.  The Court finds there is no genuine dispute that Plaintiff had knowledge of the facts that form the basis of her claims for breach of fiduciary duty, negligence, and breach of the duty of good faith and fair dealing such that she cannot show the first element required for equitable estoppel. Plaintiff through her role as stockbroker had knowledge of the sale of the Porter Paint stock in the 1980s.  She also knew during that timeframe she was no receiving monthly trust statements, as shown by her testimony about her conflicts with Junior over the management of the Trusts in the 1980s and 1990s. [DE 232-3,

Pla. Dep. at 171:13–17]. By 2003, Plaintiff was corresponding with Pullin of Savannah Bank & Trust and had engaged a lawyer about her concerns of the management of the Trusts, including her belief that principal distributions to Junior were improper and that she was not receiving monthly statements. [DE 326-3, Pl. Dep. 43: 8–24, 47:12–48:1–5, 138:4–9, 140:15–21, 182:1–3]. The May 2004 letter from Plaintiff to Stephen Pullin cited above shows that Plaintiff had knowledge at that time that PNC had allowed improper encroachments by Junior. [DE 326-18, May 19, 2004, Email; DE 326-3, Pla. Dep. at 53–54]. Other documents and Plaintiff's testimony cited above show her knowledge about the Illinois farm sales.

Plaintiff's argument that she relied on an email exchange with a representative of PNC, Kathy Karwejna, is also unpersuasive. Besides that the applicable statutes of limitations on Plaintiff's claims had run at the time of this exchange, Plaintiff does not accurately represent the email. Plaintiff argues "Kathy Karwejna claim[ed] the documents Mary was seeking to understand everything did not exist." [DE 349 at 10312 n. 37]. But review of the document reveals that Karwejna stated, "it will be difficult to find this information if it still exists" and requests Plaintiff to provide some additional information to help out with the search, such as bank account numbers and the dates of statements, so that Karwejna can see if such documents are on microfiche.  [DE 349-7]. Plaintiff responded that she would provide the information, but there is no evidence that Plaintiff did provide the information. [DE 329-7]. There is no evidence that Plaintiff relied on this email or took action or inaction based on it.  There is also no evidence in the record that Plaintiff relied on PNC's alleged omission as the record shows that Plaintiff was preoccupied with the administration of the Trusts for years, believed she was entitled to information but not getting it,

and hired counsel to assist her with her complaints about the administration of the Trusts. Plaintiff has not met her burden to show equitable estoppel against PNC.

### c. Borrowing Statute

Plaintiff raises Kentucky's borrowing statute in her response to Wells Fargo's motion. [DE 243 at 3406]. It appears she argues that the Court should apply Kentucky's borrowing statute and borrow South Carolina's statute of limitations, and its application of the discovery rule, to her breach of fiduciary duty and fraud claims against Wells Fargo. Kentucky's borrowing statute, KRS 413.320, provides:

> When a cause of action has arisen in another state or country, and by the laws of this state or country where the cause of action accrued the time for the commencement of an action thereon is limited to a shorter period of time than the period of limitation prescribed by the laws of this state for a like cause of action, then said action shall be barred in this state at the expiration of said shorter period.

KRS § 413.320. "Kentucky's borrowing statute applies the statute of limitations of another state when a cause of action accrues in that state and the other state has a shorter statute of limitations." *Vanden Bosch v. Bayer Healthcare Pharms.,* Inc., 13 F. Supp. 3d 730, 738 (W.D. Ky. 2014). There is a three-step analysis to determine the applicability of Kentucky's borrowing statute: (1) did the cause of action accrue in another state? (2) If so, is that state's statute of limitations for the particular cause of action shorter than the corresponding Kentucky statute of limitations? (3) If so, application of the accrual state is applied; if not, Kentucky's statute of limitations is applied. *Swanson v. Wilson*, 423 F. App'x 587, 593 (6th Cir. 2011).

Plaintiff neither analyzes where her causes of actions accrued, nor does she provide South Carolina's statute of limitations for the particular cause of action and whether it is shorter than the corresponding Kentucky statute of limitations. [DE 243 at 3406]. Plaintiff states that "although South Carolina does not apply here under Kentucky Borrowing principles, Plaintiff's claims were

not discovered until 2020 when the scheme to disinherit Plaintiff was uncovered along with a decades long effort to keep Plaintiff in the dark about Trust distributions and their purposes which were incongruent with the governing documents and known to the defendants." [DE 243 at 3406]. Plaintiff, having not addressed the test for applying the borrowing statute, has not met her burden in showing that Kentucky's borrowing statute applies to her claims. Nonetheless, in South Carolina, the state where the Trusts were administered from 1994 forward, claims for fraud, breach of fiduciary duty, and breach of the duty of good faith and fair dealing are subject to a 3-year statute of limitations. S.C. Code § 15-3-530; *Mazloom v. Mazloom*, 382 S.C. 307, 323, 675 S.E.2d 746, 755 (S.C. Ct. App. 2009). Plaintiff's claims would be time barred under this shorter limitations period just as they are barred under Kentucky's five-year statute of limitations. It appears she is attempting to argue that the discovery rule should apply under South Carolina law. Under South Carolina law, the discovery rule applies to claims for breach of fiduciary duty and the statute of limitations begins to run when a person could or should have known, through the exercise of reasonable diligence that a cause of action might exist. *Moore v. Benson*, 390 S.C. 153, 161, 700 S.E.2d 273, 277 (Ct. App. 2010). But, as detailed above, Plaintiff had knowledge in 2004 of her claims against Wells Fargo. Thus, the discovery rule is inapplicable, and applying it to her claims against Wells Fargo would not make her claims timely.

   f. <u>Breach of Fiduciary against Marilyn as power of attorney for Junior.</u>

   Plaintiff claims Marilyn breached her fiduciary duty. The elements of a breach-of-fiduciary-duty cause of action under Kentucky law are: (1) the existence of a fiduciary duty; (2) the breach of that duty; (3) injury; and (4) causation. *Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 436 S.W.3d 189, 193 (Ky. 2013), as modified (Feb. 20, 2014).

Plaintiff's breach of fiduciary duty claim is based on Marilyn's power of attorney for Junior as Plaintiff alleges that Marilyn used the power of attorney to remove assets from the Trusts. [DE 104, Sec. Am. Compl., ¶¶ 205, 213]. Marilyn argues there is no evidence in the record she used the power of attorney to obtain improper principal encroachments from the Trusts. Plaintiff responds that Marilyn testified that she helped Junior fill out some of the encroachment forms. [DE 265 at 5256, citing Marilyn Dep. at 308]. But Plaintiff does not dispute that Marilyn did not execute those forms under her power of attorney, and that they were executed by Junior. The only evidence in the record of Marilyn's use of the power of attorney was when Marilyn requested that the Trusts pre-pay Junior's funeral expenses. [DE 256-2, Marilyn Dep. at 396]. Amy Henderson of South State Bank could not remember if she recommended this request, but she approved this request and testified it was advisable for Junior to prepay the expenses. [Henderson Dep. at 77–80]. Marilyn argues these prepaid expenses did not end up in her trust and there is no evidence that her trust was enriched by the prepayment of expenses. Plaintiff did not respond to dispute this argument or evidence in her response to Marilyn's motion for summary judgment. Based on this record, no reasonable juror could find Marilyn breached her fiduciary duty and this claim fails as a matter of law.

g. Breach of duty of good faith and fair dealing against Marilyn as power of attorney for Junior.

Plaintiff's claim against Marilyn for breach of duty of good faith and fair dealing fails as a matter of law.[9] "Kentucky does impose an obligation of good faith and fair dealing in performing a contract. But Kentucky law does not provide a cause of action for a breach of good faith and fair dealing outside the insurance context." *Bennett v. Bank of Am., N.A.*, 126 F. Supp. 3d 871, 881

---

[9] Plaintiff's claims against Wells Fargo and PNC for breach of the duty of good faith and fair dealing also fail as matter of law.

(E.D. Ky. 2015); *see Davidson v. Amer. Freightways, Inc.*, 25 S.W.3d 94, 102 (Ky. 2000) ("[T]he tort of 'bad faith' appl[ies] only to those persons or entities (and their agents) who are engaged . . . in the business of entering into contracts of insurance") (internal quotations omitted); *see also Ennes v. H & R. Block E. Tax Servs., Inc.*, No. 3:01CV–447–H, 2002 WL 226345, at *4 (W.D. Ky. Jan. 11, 2002) ("Kentucky courts have not extended the tort action for breach of the covenant of good faith and fair dealing to non-insurance contracts"). Because Kentucky law "does not provide a cause of action for a breach of good faith and fair dealing outside the insurance context," and this is not a case involving an insurance dispute, Plaintiff's claim fails as a matter of law. Plaintiff did not directly address this law in her response to Marilyn's motion. As a result, the Court grants Marilyn's motion as to this claim.

h.   Intentional interference with contract against Marilyn.

Plaintiff also alleges Marilyn intentionally interfered with contract. [DE 104, Sec. Am. Compl. ¶¶ 229-35]. This claim has a five-year statute of limitations. *Richie v. United Mine Workers of Am.*, 410 F.2d 827, 832 (6th Cir. 1969). To maintain a tortious interference with contract claim, a plaintiff must prove these elements (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) that the defendant intended to cause a breach; (4) that the defendant's actions did indeed cause a breach; (5) that damages resulted to the plaintiff, and (6) that the defendant had no privilege or justification to excuse its conduct. *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 5–6 (Ky. App. 2012); *Louisville Outlet Shoppes, LLC v. Paragon Outlet Partners, LLC*, No. 2014-CA-001699-MR, 2016 WL 929740, at *2 (Ky. Ct. App. Mar. 11, 2016). "Kentucky courts and federal courts alike have recognized that the exercise of legitimate contract rights cannot give rise to an intentional interference claim." *Raheel Foods, LLC v. Yum! Brands, Inc.*, No. 3:16-CV-00451-GNS, 2017 WL 217751, at *4 (W.D. Ky. Jan. 18, 2017).

Plaintiff's claim is essentially that Marilyn interfered with the trustees' contract with the Trusts to act as fiduciary by pressuring them to allow improper principal encroachments by creating an artificial need for principal encroachments by omitting assets on the encroachment forms. This, Plaintiff alleges, caused the Trustees to breach their contracts with the Trusts. [DE 104, Sec. Am. Compl. ¶¶ 229].

Marilyn first argues that this claim fails because she was a remainder net income beneficiary under Senior's Trust Under Agreement as Junior's surviving spouse. Plaintiff's complaint alleged that Marilyn was not a beneficiary of the Trusts in relation to this claim. The Court agrees with Marilyn that she is the surviving spouse under Senior's Trust Under Agreement and thus remainder an income beneficiary under Senior's Trust Under Agreement until her remarriage or death per its terms. [DE 232-3, Item III(3)]. When interpreting a trust "the first and most important guide is the plain language of the instrument." *Benjamin v. JP Morgan Chase Bank, N.A.*, 305 S.W.3d 446, 451 (Ky. App. 2010) (internal citations omitted). "If the language used is a reasonably clear expression of intent, then the inquiry need go no further." *Id.* Under the language of Senior's Trust Under Agreement, upon Junior's death, the trustee must pay its "net income" to Junior's "spouse" until the death or remarriage of "such spouse." [DE 232-3, Item III(3)]. There is no dispute that Marilyn was Junior's spouse at the time of his death and that she has not remarried or died. [DE 232-4, Pl. Dep. at 34:23–36:9; *id.* at 189:9–12]. Under the plain terms of Senior's Trust Under Agreement, Marilyn had a right to receive "net income" and discretionary principal upon Junior's death in 2018 and therefore to share in its distribution upon its termination in 2020. Thus Plaintiff's allegation in her complaint under her claim for tortious interference with contract that Marilyn was not a beneficiary is incorrect. But while Marilyn was a beneficiary under one of the three trusts, that fact alone would not necessarily be fatal to

Plaintiff's claim as even a beneficiary could tortiously interfere with the trustee's contract. Plaintiff's argument is that Marilyn was tortiously interfering with the Trustee's duties of trust by causing them to improperly approve principal encroachments, which Marilyn, even as an income beneficiary and discretionary principal beneficiary, would not necessarily have been entitled to under the Trusts terms. At the same time, Marilyn's exercise of legitimate rights as a beneficiary could not give rise to a tortious interference claim.

While Marilyn was aware of the Trusts themselves, the Court has been presented with no evidence of Marilyn's knowledge of the Trustees' contracts with the Trusts. This alone destroys the Plaintiff's claim for intentional interference with contract on Marilyn's motion for summary judgment. The Court also has doubts that Plaintiff could raise a genuine issue of material fact on the fourth element of this claim, that Marilyn's alleged actions caused the Trustees to breach their contracts in permitting improper principal encroachments, but the Court need not address that element. Although unnecessary because Plaintiff fails to present a genuine issue on the second element of the claim, the Plaintiff would likewise fail to show a genuine dispute of material fact that a reasonable juror could rely on to find under the third element that Marilyn intended to cause the trustees to breach their duty. Stephen Pullin testified that Marilyn "was not involved in any investment decisions or any type of policy decisions." [DE 256-8, Pullen Dep. at 80]. Amy Peirsol testified that she had little interaction with Marilyn and that Marilyn never directed her to do anything. [DE 256-9, Peirsol Dep. at 194]. Amy Henderson testified that she never felt obligated to comply with any request of Marilyn. [DE 256-10, Henderson Dep. at 209, 213]. Plaintiff counters that Marilyn received significant funds from the Trusts. But Plaintiff cites no law that says Marilyn, as the spouse of Junior, could not share in the benefits that Junior received from the Trusts. The Trusts provided Junior with net income and placed no limit on what Junior could do

with funds from the Trusts once he received them. [DE 232-1, Item II(3)(e); DE 232-2, Item VII(1); DE 232-3, Item V]. The Trusts also permitted Junior to receive trust principal for broad purposes like "health," "welfare, "maintenance," and "comfort." [DE 232-1 at Item II(3)(g); DE 232-2 at Item VII(2); DE 232-3 at Item V]. The Trusts did not prohibit Junior's spouse from indirectly benefiting and Plaintiff cites no law in support of such a proposition.

Plaintiff also argues that Marilyn erroneously received principal from the Trusts after Junior's death. Plaintiff refers to a typographical error on the order approving the final settlement for on of the trusts after Junior died, which erroneously listed a payment of $750 as principal when it was in fact was from the trust's income. [DE 268-1, Kathy Palmer Aff. at 5600–601]. And Marilyn submitted a budget as a prerequisite for requesting a principal encroachment but the request was denied by Amy Henderson. [DE 256-1 at 208-09]. Thus, there is no evidence that Marilyn received any principal distribution, improper or not, after Junior's death.

Plaintiff argues that Marilyn helped Junior fill out encroachment forms that Plaintiff claims omitted information that would have made a difference in whether the encroachments were permitted. The Court has reviewed Marilyn's testimony cited by Plaintiff [DE 265-5 at 308–309] as well as the forms cited by Plaintiff [DE 265-7], and the testimony of Amy Henderson at South State Bank cited by Plaintiff [DE 265-11 at 223]. Plaintiff argues the forms omitted a $670,000 Wells Fargo account and that created an artificial need for principal encroachment.  It appears the Wells Fargo accounts may have been listed on the 2015 form, were not listed on the 2016 form, were listed on the 2017, and there is an undated form that presumably was from around 2018.  [DE 265-7]. It is unclear whether the Wells Fargo account listed amounts for stocks and bonds of around $195,000. Plaintiff relies on Amy Henderson's testimony that Marilyn omitting the Wells Fargo trust off the forms created an artificial need and is thus evidence of intent to cause the

43

trustees to breach their duty to the Trusts interfere with the Trusts. But upon review of the testimony, Ms. Henderson did not recall that the Wells Fargo account was omitted off the 2018 and 2019 form. Instead, Ms. Henderson was asked that if forms "from 2017 and 2018 and 2019 reflected an omission . . . that would appear to present that there is more of a need based on outside assets for a distribution . . ," to which Henderson said, "yes." [DE 256-1 at 222]. But as noted above, the 2017 form included the account while it is not clear that the undated form presumably from 2018 did not include the account.  The house owned by Marilyn was listed on the assets of the forms.  The Court is not convinced that this evidence, that Marilyn may have omitted the Wells Fargo account held in trust on a form in 2018 and which is basically supposition and speculation, would create a genuine issue of material fact as to whether Marilyn intended to cause the trustee at that time, South State Bank, to breach its contract with the Trusts. In addition, there is no dispute, as mentioned above, that the claim fails on its second element as well. For these reasons, the Court grants summary judgment for Marilyn on Plaintiff's tortious interference with contract claim.

      i.  <u>Constructive Trust against Marilyn.</u>

Plaintiff asserts a claim against Marilyn for constructive trust, alleging that assets that should belong to Plaintiff are in Marilyn's or her trust's possession, [DE 104, Sec. Am. Compl. ¶¶ 236-239], and that the Court should impose a constructive trust upon this property. A constructive is not an independent cause of action, but an equitable remedy. *Bewley v. Heady*, 610 S.W.3d 352, 357–58 (Ky. Ct. App. 2020). A court may impose a constructive trust to remedy certain misconduct, such as fraud, breach of fiduciary duty, or unjust enrichment. *Id.* at 358. Because constructive trusts do not operate as an independent claim, and the Court has granted Marilyn summary judgment on Plaintiff's fraud, breach of fiduciary duty, and other claims,  the Court grants Marilyn summary judgment on Plaintiff's constructive trust claim.

j.   Accounting claim

Plaintiff's accounting claim against Wells Fargo and PNC seeks information and production of documents relating to the Trusts' administration. [DE 104, Sec. Am. Compl. ¶¶ 241 243]. "The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is . . . the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962). To maintain an accounting claim, "the plaintiff must be able to show that the accounts between the parties are of such a complicated nature that only a court of equity can satisfactorily unravel them." *Id.* (internal quotation marks and citations omitted). If available legal remedies, including discovery, are adequate, then there is no basis for an accounting claim. *Bus. Payment Sys., LLC v. Nat'l Processing Co.,* No. 3:10-CV-00669, 2012 WL 6020400, at *18 (W.D. Ky. Dec. 3, 2012), *order clarified*, No. 3:10-CV-00669-CRS, 2014 WL 4215590 (W.D. Ky. Aug. 25, 2014). Plaintiff does not allege that there is no adequate remedy at law or that the accounts between the parties are so complicated that a court of equity is necessary to unravel them and thus the claim fails as a matter of law.  Further, Wells Fargo and PNC have produced all documents in their possession relating to the Trusts.  Plaintiff's sought relief being fulfilled, the claim is moot.

## II.   CONCLUSION

For the reasons above, the Court **ORDERS** as follows:

1.   Defendant Wells Fargo Bank, N.A.'s motion for summary judgment [DE 232] is

      **GRANTED**;

2.   Defendant Marilyn Casey Eitel's motion for summary judgment [DE 256] on

      **GRANTED**;

3.  Defendant PNC Bank, N.A.'s motion for summary judgment [DE 326] is **GRANTED**;

4.  The Plaintiff's claim against South State Bank, N.A. are **DISMISSED** as abandoned;

5.  The Plaintiff's claims against South State Advisory, Inc. are **DISMISSED** as abandoned;

6.  All other pending motions, including but not limited to [DEs 320, 321, 323, 324, 325, 327, 329, 330, and 341] are **DENIED** as moot.

7.  The Court will issue separate judgment.

Rebecca Grady Jennings, District Judge

United States District Court

February 23, 2023